**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARLA JAMES; WAYNE
WASHINGTON; JAMES ARMANTROUT;
CHARLES DANIEL DEJONG,
            *Plaintiffs-Appellants,*

v.

CITY OF COSTA MESA, a city
incorporated under the laws of the
State of California; CITY OF LAKE
FOREST, a city incorporated under
the laws of the State of California,
            *Defendants-Appellees.*

No. 10-55769

D.C. No.
8:10-cv-00402-
AG-MLG

ORDER
AMENDING
OPINION AND
PARTIAL
CONCURRENCE/
PARTIAL
DISSENT AND
DENYING
PETITION FOR
REHEARING AND
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted
May 6, 2011—Pasadena, California

May 21, 2012
Amended November 1, 2012

13057

Before: Harry Pregerson, Raymond C. Fisher and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Fisher;
Partial Concurrence and Partial Dissent by Judge Berzon

## COUNSEL

Matthew Pappas, Law Office of Matthew Pappas, Mission Viejo, California, for the appellants.

James R. Touchstone and Krista MacNevin Jee, Jones & Meyer, Fullerton, California, for appellee City of Costa Mesa.

Jeffrey V. Dunn (argued), Daniel S. Roberts and Lee Ann Meyer, Best Best & Krieger LLP, Irvine, California, for appellee City of Lake Forest.

Thomas E. Perez and Tony West, Assistant Attorneys General, and Mark L. Gross and Roscoe Jones, Jr., Attorneys, Department of Justice, Washington, D.C., for the United States as amicus curiae.

**ORDER**

Judge Pregerson and Judge Fisher have voted to deny the petition for rehearing and rehearing en banc. Judge Berzon has voted to grant the petition for rehearing and rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellants' petition for rehearing and rehearing en banc, filed June 4, 2012, is **DENIED**.

The amended opinion and amended partial concurrence/partial dissent filed May 21, 2012, will be filed concurrently with this order.

No further petitions for rehearing will be considered.

---

**OPINION**

FISHER, Circuit Judge:

The plaintiffs are severely disabled California residents. They alleged that "[c]onventional medical services, drugs and medications" have not alleviated the pain caused by their impairments. Each of them has therefore "obtained a recommendation from a medical doctor" to use marijuana to treat her pain. This medical marijuana use is permissible under California law, *see* Cal. Health & Safety Code § 11362.5(d) (suspending state-law penalties for marijuana possession and cultivation for seriously ill Californians and their caregivers who "possess[ ] or cultivate[ ] marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician"), but prohibited by

the federal Controlled Substances Act (CSA), *see* 21 U.S.C. §§ 812(b)(1)(B), 812(c) sched. I (c)(10), 841(a), 844(a).

The plaintiffs obtain medical marijuana through collectives located in Costa Mesa and Lake Forest, California. These cities, however, have taken steps to close marijuana dispensing facilities operating within their boundaries. Costa Mesa adopted an ordinance excluding medical marijuana dispensaries completely in 2005. *See* Costa Mesa, Cal., Ordinance 05-11 (July 19, 2005). Some marijuana dispensing facilities, including the Costa Mesa collectives, have apparently continued to operate despite the ordinance, but the plaintiffs alleged that Costa Mesa police have recently "raided operating marijuana collectives and detained collective members."[1] Lake Forest has also allegedly raided medical marijuana collectives operating within city limits, and has brought a public nuisance action in state court seeking to close them. *See City of Lake Forest v. Moen*, No. 30-2009-298887 (Orange Cnty. Super. Ct. filed Sept. 1, 2009).

Concerned about the possible shutdown of the collectives they rely on to obtain medical marijuana, the plaintiffs brought this action in federal district court, alleging that the cities' actions violate Title II of the Americans with Disabilities Act (ADA), which prohibits discrimination in the provision of public services.[2] District Judge Guilford sympathized

---

[1]We assume, as the parties do, that Costa Mesa's efforts to close medical marijuana "dispensaries" include the marijuana dispensing facilities that serve the plaintiffs, which the complaint terms "collectives." Compl. ¶¶ 6, 10-11.

[2]The complaint alleged that "[e]ach of the plaintiffs is a qualified person with a disability as defined in the ADA." Compl. ¶ 4. It further alleged that each of the defendant cities is covered by Title II, under which public entities "must not intentionally or on a disparate impact basis discriminate against the disabled individual's meaningful access to public services." *Id.* ¶ 20. The complaint sought an order requiring the cities to "cease and desist any further action to remove existing marijuana collectives organized under the laws of California," as well as to establish regulations "that will accommodate the needs of qualified persons under the ADA so as to be able to legally access marijuana under California law." *Id.* at 5-6.

with the plaintiffs, but denied their application for preliminary injunctive relief on the ground that the ADA does not protect against discrimination on the basis of marijuana use, even medical marijuana use supervised by a doctor in accordance with state law, unless that use is authorized by federal law.

We affirm. We recognize that the plaintiffs are gravely ill, and that their request for ADA relief implicates not only their right to live comfortably, but also their basic human dignity. We also acknowledge that California has embraced marijuana as an effective treatment for individuals like the plaintiffs who face debilitating pain. Congress has made clear, however, that the ADA defines "illegal drug use" by reference to federal, rather than state, law, and federal law does not authorize the plaintiffs' medical marijuana use. We therefore necessarily conclude that the plaintiffs' medical marijuana use is not protected by the ADA.[3]

---

[3]We do *not* hold, as the dissent states, that "medical marijuana users are not protected by the ADA in any circumstance." We hold instead that the ADA does not protect medical marijuana users who claim to face discrimination *on the basis of* their marijuana use. *See* 42 U.S.C. § 12210(a) (the illegal drug use exclusion applies only "when the covered entity acts on the basis of such use"). As the Equal Employment Opportunity Commission has explained,

> A person who alleges disability based on one of the excluded conditions [such as current use of illegal drugs or compulsive gambling, *see* 42 U.S.C. § 12211(b)(2),] is not an individual with a disability under the ADA. Note, however, that a person who has one of these conditions is an individual with a disability if (s)he has another condition that rises to the level of a disability. See House Education and Labor Report at 142. Thus, a compulsive gambler who has a heart impairment that substantially limits his/her major life activities is an individual with a disability. Although compulsive gambling is not a disability, the individual's heart impairment is a disability.

U.S. Equal Emp't Opportunity Comm'n, Section 902 Definition of the Term Disability, at § 902.6 (last modified No. 21, 2009), *available at* http://www.eeoc.gov/policy/docs/902cm.html (last visited Apr. 27, 2012).

## Discussion

Title II of the ADA prohibits public entities from denying the benefit of public services to any "qualified individual with a disability." 42 U.S.C. § 12132.[4] The plaintiffs alleged that, by interfering with their access to the medical marijuana they use to manage their impairments, Costa Mesa and Lake Forest have effectively prevented them from accessing public services, in violation of Title II. As the district court recognized, however, the ADA also provides that "the term 'individual with a disability' does not include an individual who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." *Id.* § 12210(a). This case turns on whether the plaintiffs' medical marijuana use constitutes "illegal use of drugs" under § 12210.[5]

Section 12210(d)(1) defines "illegal use of drugs" as

> the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act. Such term does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.

*Id.* § 12210(d)(1). The parties agree that the possession and distribution of marijuana, even for medical purposes, is gener-

---

[4]Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" includes "any State or local government," *id.* § 12131(1)(A), and there is no dispute that the defendant cities are public entities for purposes of Title II.

[5]The cities do not dispute that they have acted "on the basis of" the plaintiffs' marijuana use by restricting the operation of the medical marijuana collectives on which the plaintiffs rely.

ally unlawful under the CSA, and thus that medical marijuana use falls within the exclusion set forth in § 12210(d)(1)'s first sentence. They dispute, however, whether medical marijuana use is covered by one of the exceptions in the second sentence of § 12210(d)(1). The plaintiffs contend their medical marijuana use falls within the exception for drug use supervised by a licensed health care professional. They alternatively argue that the exception for drug use "authorized by . . . other provisions of Federal law" applies. We consider each argument in turn.

## I.

We first decide whether the plaintiffs' marijuana use falls within § 12210's supervised use exception.

**[1]** There are two reasonable interpretations of § 12210(d)(1)'s language excepting from the illegal drug exclusion "use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law." The first interpretation — urged by the plaintiffs — is that this language creates *two* exceptions to the illegal drug exclusion: (1) an exception for professionally supervised drug use carried out under *any* legal authority; and (2) an independent exception for drug use authorized by the CSA or other provisions of federal law. The second interpretation — offered by the cities and adopted by the district court — is that the provision contains a *single* exception covering all uses authorized by the CSA or other provisions of federal law, including both CSA-authorized uses that involve professional supervision (such as use of controlled substances by prescription, as authorized by 21 U.S.C. § 829, and uses of controlled substances in connection with research and experimentation, as authorized by 21 U.S.C. § 823(f)), and other CSA-authorized uses. Under the plaintiffs' interpretation, their state-sanctioned, doctor-recommended marijuana use is covered under the supervised use exception. Under the cities' interpre-

tation, the plaintiffs' state-authorized medical marijuana use is not covered by any exception because it is not authorized by the CSA or another provision of federal law. Although § 12210(d)(1)'s language lacks a plain meaning and its legislative history is not conclusive, we hold, in light of the text and legislative history of the ADA, as well as the relationship between the ADA and the CSA, that the cities' interpretation is correct.

The meaning of § 12210(d)(1) cannot be discerned from the text alone. Both interpretations of the provision are somewhat problematic. The cities' reading of the statute renders the first clause in § 12210(d)(1)'s second sentence superfluous; if Congress had intended that the exception cover only uses authorized by the CSA and other provisions of federal law, it could have omitted the "taken under supervision" language altogether. But the plaintiffs' interpretation also fails to "giv[e] effect to each word" of § 12210(d)(1), *United States v. Cabaccang*, 332 F.3d 622, 627 (9th Cir. 2003) (en banc), for if Congress had really intended that the language excepting "other uses authorized by the Controlled Substances Act or other provisions of Federal law" be entirely independent of the preceding supervised use language, it could have omitted the word "other," thus excepting "use of a drug taken under supervision by a licensed health care professional, *or uses* authorized by the Controlled Substances Act." Moreover, unless the word "other" is omitted, the plaintiffs' interpretation renders the statutory language outright awkward. One would not *naturally* describe "the use of a drug taken under supervision by a licensed health care professional, or *other* uses authorized by the Controlled Substances Act or other provisions of Federal law" unless the supervised uses were a *subset* of the uses authorized by the CSA and other provisions of federal law. The plaintiffs' reading thus results not only in surplusage, but also in semantic dissonance. *Cf. Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 806 (9th

Cir. 2008) (declining to adopt the plaintiff's "tortured reading of the statute's plain text").[6]

[2] The cities' interpretation also makes the most sense of the contested language when it is viewed in context. *See United States v. Havelock*, 664 F.3d 1284, 1289 (9th Cir. 2012) (en banc) ("Statutory interpretation focuses on 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.' " (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997))). Here, the context reveals Congress' intent to define "illegal use of drugs" by reference to federal, rather than state, law. Section 12210(d)(1) mentions the CSA by name twice, and § 12210(d)(2) provides that "[t]he term 'drug' means a controlled substance, as defined in schedules I through V of section 202 of the Controlled Substances Act." 42 U.S.C. § 12210(d)(2).

We therefore conclude that the cities' interpretation of the statutory text is the more persuasive, though we agree with the dissent that the text is ultimately inconclusive.[7] We there-

---

[6]Unlike our dissenting colleague, we do not place great significance on the use of a comma to separate supervised uses from other uses authorized by the CSA and other federal laws. We very much doubt Congress would have relied on a single comma to acknowledge the legitimacy of a highly controversial medical practice. *Cf. Crandon v. United States*, 494 U.S. 152, 169 (1990) (Scalia, J., concurring) (remarking, in discounting the significance of a misplaced comma, that "the evidence . . . should be fairly clear before one concludes that Congress has slipped in an additional requirement in such an unusual fashion").

[7]Although the parties did not raise it, we have considered the rule of the last antecedent, under which "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). "The rule of the last antecedent, however, 'is not an absolute and can assuredly be overcome by other indicia of meaning.' " *United States v. Hayes*, 555 U.S. 415, 425 (2009) (quoting *Barnhart*, 540 U.S. at 26); *see also Nw. Forest Resource Council v. Glickman*, 82 F.3d 825, 833 (9th Cir. 1996) (holding that "the doctrine of last antecedent . . . must yield to the most logical

fore look to legislative history, including related congressional activity.[8]

The legislative history of § 12210(d), like its text, is indeterminate. It is true, as the plaintiffs point out, that Congress rejected an early draft of the "taken under supervision" exception in favor of a broader version. *Compare* S. 933, 101st Cong. § 512(b) (as passed by the Senate, Sept. 7, 1989) ("The term 'illegal drugs' does not mean the use of a controlled substance *pursuant to a valid prescription* or other uses authorized by the Controlled Substances Act or other provisions of Federal law." (emphasis added)), *with* H.R. 2273, 101st Cong. § 510(d)(1) (as passed by the House, May 22, 1990) ("Such term does not include the use of a drug *taken under supervi-*

---

meaning of a statute that emerges from its plain language and legislative history"). In the context presented here, the rule of the last antecedent does not make the meaning of the statutory text plain and unambiguous. Nor, in resolving the ambiguous text, does whatever presumption the rule confers outweigh other indicia of meaning. As we explain, the language, the legislative history, including the historical congressional context, the relationship between the ADA and the CSA and the absurd results the plaintiffs' interpretation would produce all support the interpretation the cities urge and the United States has embraced as amicus curiae.

[8] " 'If the statutory language is unambiguous and the statutory scheme is coherent and consistent,' judicial inquiry must cease." *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012) (quoting *In re Ferrell*, 539 F.3d 1186, 1190 n.10 (9th Cir. 2008)). If the statute is ambiguous, however, "we may use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent." *Probert v. Family Centered Servs. of Alaska, Inc.*, 651 F.3d 1007, 1011 (9th Cir. 2011) (quoting *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1133 (9th Cir. 2009)) (internal quotation marks omitted). "We may also look to other related statutes because 'statutes dealing with similar subjects should be interpreted harmoniously.' " *Tides v. Boeing Co.*, 644 F.3d 809, 814 (9th Cir. 2011) (quoting *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008)); *see also Tidewater Oil Co. v. United States*, 409 U.S. 151, 157-58 (1972) (stating that "it is essential that we place the words of a statute in their proper context by resort to the legislative history," including related congressional activity addressing the same subject matter).

*sion by a licensed health care professional*, or other uses authorized by the Controlled Substances Act or other provisions of Federal law." (emphasis added)), *and* H.R. Conf. Rep. No. 101-596, at 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 565, 596 (explaining that the House version of the illegal drug exclusion was chosen over the Senate version). We are not persuaded, however, that this history compels the plaintiffs' interpretation of § 12210(d)(1). Although the expansion of the supervised use exception suggests Congress wanted to cover more than just CSA-authorized *prescription-based* use, it does not demonstrate that the exception was meant to extend beyond the set of uses authorized by the CSA and other provisions of federal law. The CSA does authorize some professionally supervised drug use that is not prescription-based, *see* 21 U.S.C. § 823(f) (providing for practitioner dispensation of controlled substances in connection with approved research studies), and Congress could have intended simply to expand the supervised use exception to encompass all such uses.

**[3]** One House Committee Report does include a brief passage that arguably supports the notion that § 12210(d)(1)'s supervised use language and its authorized use language are independent. *See* H.R. Rep. No. 101-485, pt. 3, at 75 (1990) ("The term 'illegal use of drugs' does not include the use of controlled substances, including experimental drugs, taken under the supervision of a licensed health care professional. It *also* does not include uses authorized by the Controlled Substances Act or other provisions of federal law." (emphasis added)). This discussion is of limited persuasive value, however, because it may rest on the unstated assumption — quite plausible at the time — that professionally supervised use of illegal drugs would always be consistent with the CSA. In fact, the experimental drug use listed in the House Committee Report as an example of the sort of use covered by the supervised use exception is itself CSA-authorized. *See* 21 U.S.C. § 823(f). There is no reason to think that the 1990 Congress that passed the ADA would have anticipated later changes in

state law facilitating professional supervision of drug use that federal law does not permit. The first such change came six years later, when California voters passed Proposition 215, now codified as the Compassionate Use Act of 1996. *See Gonzales v. Raich*, 545 U.S. 1, 5 (2005).

Although it is true, as the dissent points out, that use of marijuana for medical purposes "was not unthinkable" in 1990, before, during and after adoption of the ADA there has been a strong and longstanding federal policy against medical marijuana use outside the limits established by federal law itself. *See id.* at 5-6, 10-14 (contrasting California's historical tolerance for medical marijuana with comprehensive federal limits on marijuana possession imposed by Congress in 1970). In 1970, despite marijuana's known historical use for medical purposes, Congress listed marijuana as a Schedule I drug, designating it as a substance having "a high potential for abuse," "no currently accepted medical use in treatment in the United States" and "a lack of accepted safety [standards] for use . . . under medical supervision." Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, tit. II, § 202(b)(1), 84 Stat. 1236, 1247 (codified at 21 U.S.C. § 812(b)(1)). In 1989, the Administrator of the Drug Enforcement Agency (DEA) rejected an administrative law judge's recommendation that marijuana be relisted from Schedule I to Schedule II because of its therapeutic advantages. The Administrator said that "marijuana has not been demonstrated as suitable for use as a medicine." 54 Fed. Reg. 53,767, 53,768 (Dec. 29, 1989). The DEA once again rejected rescheduling in 1992, reaffirming the absence of accepted medical use of marijuana. *See* 57 Fed. Reg. 10,499 (Mar. 26, 1992). It did so again in 2001. *See* 66 Fed. Reg. 20,038 (Apr. 18, 2001). In 1992, the Federal Drug Administration (FDA) *closed* the Investigational New Drug (IND) Compassionate Access Program, which had begun in 1978 and had allowed a few dozen patients whose serious medical conditions could be relieved only by marijuana to apply for and receive marijuana from the federal government. *See Conant v. Walters*,

309 F.3d 629, 648 (9th Cir. 2002); Mark Eddy, Cong. Research Serv., RL 33211, Medical Marijuana: Review and Analysis of Federal and State Policies 8 (2010). In 1998, Congress passed the Omnibus Consolidated and Emergency Supplemental Appropriations Act for 1999, Pub. L. No. 105-277, 112 Stat. 2681 (1998). Under the heading "Not Legalizing Marijuana for Medicinal Use," this provision stated in part, "Congress continues to support the existing Federal legal process for determining the safety and efficacy of drugs and opposes efforts to circumvent this process by legalizing marijuana, and other Schedule I drugs, for medicinal use without valid scientific evidence and the approval of the Food and Drug Administration." *Id.* Every year between 1998 and 2009, Congress *blocked* implementation of a voter-approved initiative allowing for the medical use of marijuana in the District of Columbia. *See, e.g.*, Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, § 167, 113 Stat. 1501, 1530 (1999). Between 2003 and 2007, the House annually, and by large margins, *rejected* legislation that would have prevented the Justice Department from using appropriated funds to interfere with implementation of medical marijuana laws in the states that approved such use. *See* Eddy, *supra*, at 4-5.

Under the plaintiffs' view, the ADA worked a substantial departure from this accepted federal policy by extending federal protections to federally prohibited, but state-authorized, medical use of marijuana. That would have been an extraordinary departure from policy, and one that we would have expected Congress to take *explicitly*. *Cf. CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1148 (D.C. Cir. 1987) (noting that the Supreme Court has "insisted on some clear evidence of congressional intent to work 'a substantial change in accepted practice' through [a statutory] revision"). It is unlikely that Congress would have wished to legitimize state-authorized, federally proscribed medical marijuana use without debate, in an ambiguously worded ADA provision.

[4] Moreover, contrary to the dissent's suggestion, Congress did not need to include medical marijuana use under the

ADA's supervised use exception to ensure that the federal medical marijuana program — the IND Compassionate Access Program — would be covered by § 12210(d)(1). The federal program was presumably authorized by the CSA's limited experimental research provisions, *see* 21 U.S.C. § 823(f), and was thus already covered by the portion of § 12210(d)(1) that excepts CSA-authorized uses. The same is true of the "experimental treatment" programs referenced in the Justice Department memorandum that the dissent cites. We do not quarrel with the dissent's observation that Congress intended the supervised medical use exception to apply to experimental use of controlled substances, including, perhaps, experimental use of marijuana. These experimental uses, however, are *authorized by federal law*, and subject to a comprehensive federal regulatory regime. We find nothing in the legislative history to suggest that Congress intended to extend ADA protection to state-authorized, but federally prohibited, uses of marijuana falling outside this regulatory framework. There is not one word in the statute or in the legislative history suggesting that Congress sought to exclude from the definition of illegal drug use the use of a controlled substance that was lawful under state law but unlawful and unauthorized under federal law.

The cities' interpretation not only makes the best sense of the statute's text and the historical context of its passage, but also is the only interpretation that fully harmonizes the ADA and the CSA. *See In re Transcon Lines*, 58 F.3d 1432, 1440 (9th Cir. 1995) ("[W]e must, whenever possible, attempt to reconcile potential conflicts in statutory provisions."). To conclude that use of marijuana for medical purposes is *not* an illegal use of drugs under the ADA would undermine the CSA's clear statement that marijuana is an unlawful controlled substance that has "no currently accepted medical use in treatment in the United States." 21 U.S.C. § 812(b)(1)(B). As noted, Congress reaffirmed this principle in a 1998 appropriations act, *see* Pub. L. No. 105-277, div. F., 112 Stat. 2681, 2681-760 (1998) ("It is the sense of Congress that . . . mari-

juana . . . [has] not been approved . . . to treat any disease or condition."), and the government has reiterated it in a number of decisions and advisory memoranda, as well as in its amicus brief in this appeal. *See* Brief for the United States as *Amicus Curiae*; *see also* Memorandum from Deputy Att'y Gen. David W. Ogden to Selected U.S. Att'ys, at 1 (Oct. 19, 2009) [hereinafter Ogden Memo] ("Congress has determined that marijuana is a dangerous drug."); Memorandum from Deputy Att'y Gen. James M. Cole to U.S. Att'ys, at 1 (June 29, 2011) (same); Memorandum from Helen R. Kanovsky, Dep't of Hous. & Urban Dev., to John Trasviña, Assistant Sec'y for Fair Hous. & Equal Opportunity, et al., at 2 (Jan. 20, 2011) [hereinafter Kanovsky Memo] (stating that marijuana "may not be legally prescribed by a physician for any reason").[9]

**[5]** Accordingly, in light of the text, the legislative history, including related congressional activity, and the relationship between the ADA and the CSA, we agree with both district courts that have considered the question, as well as the Department of Housing and Urban Development and the United States as amicus curiae, in concluding that doctor-supervised marijuana use is an illegal use of drugs not covered by the ADA's supervised use exception. *See James v. City of Costa Mesa*, No. SACV 10-0402 AG (MLGx), 2010 WL 1848157, at *4 (C.D. Cal. Apr. 30, 2010); *Barber v. Gonzales*, No. CV-05-0173-EFS, 2005 WL 1607189, at *1 (E.D. Wash. July 1, 2005); Kanovsky Memo at 5 ("Under . . . the

---

[9]Before oral argument, we invited the view of the United States as amicus curiae. The government accepted our invitation and filed an amicus brief supporting the cities' interpretation:

> The proper interpretation of the term "illegal use of drugs," as defined in 42 U.S.C. [§ ] 12210(d), includes the use of marijuana taken under doctor supervision, unless that use is authorized by the CSA or another federal law, which is not the case here. Federal law makes clear that medical marijuana use does not receive special protection under the ADA.

Brief for the United States as *Amicus Curiae* at 10.

ADA, whether a given drug or usage is 'illegal' is determined exclusively by reference to the CSA. . . . While . . . the ADA contain[s] language providing a physician-supervision exemption to the 'current illegal drug user' exclusionary provisions, this exemption does not apply to medical marijuana users.").[10]

A contrary interpretation of the exception for "use of a drug taken under supervision by a licensed health care professional" would allow a doctor to recommend the use of *any* controlled substance — including cocaine or heroin — and thereby enable the drug user to avoid the ADA's illegal drug exclusion. Congress could not have intended to create such a capacious loophole, especially through such an ambiguous provision. *Cf. Ross v. Ragingwire Telecomms., Inc.*, 174 P.3d 200, 207 (Cal. 2008) (observing, in interpreting California's employment discrimination law, that "given the controversy that would inevitably have attended a legislative proposal to require employers to accommodate marijuana use, we do not believe that [the relevant statute] can reasonably be understood as adopting such a requirement silently and without debate").[11]

**[6]** We recognize that the federal government's views on the wisdom of restricting medical marijuana use may be

---

[10]We do not, as the dissent suggests, resolve the statutory ambiguity based on an imagined inconsistency between the express terms of the ADA and "general considerations of supposed public interests" derived from the CSA. *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 43 (1987) (quoting *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983)) (internal quotation marks omitted). The CSA directly addresses whether medical marijuana use constitutes illegal use of drugs, and clearly states that such use is unlawful.

[11]The dissent dismisses this problem, arguing that state licensing requirements are sufficient to limit the reach of the supervised use exception. State licensing requirements do not eliminate the potential absurdity, however. A doctor who recommends the use of an illegal drug might still succeed in preserving ADA protection for the drug user, even if the doctor's behavior might ultimately result in discipline before the state licensing authority.

evolving. *See* Ogden Memo at 1-2 (advising against using federal resources to investigate and prosecute "individuals whose actions are in clear and unambiguous compliance with existing state laws providing for the medical use of marijuana"). But for now Congress has determined that, for purposes of federal law, marijuana is unacceptable for medical use. *See* 21 U.S.C. § 812(b)(1)(B). We decline to construe an ambiguous provision in the ADA as a tacit qualifier of the clear position expressed in the CSA. Accordingly, we hold that federally prohibited medical marijuana use does not fall within § 12210(d)(1)'s supervised use exception.

## II.

The plaintiffs contend that even if their marijuana use does not fall within the § 12210(d)(1) exception for "use of a drug taken under supervision by a licensed health care professional," it nonetheless comes within the separate exception for drug use "authorized by . . . other provisions of Federal law," by virtue of recent congressional action allowing the implementation of a Washington, D.C. medical marijuana initiative. We reject this argument.

**[7]** D.C.'s Initiative 59 suspended local criminal penalties for seriously ill individuals who use medical marijuana with a doctor's recommendation. *See* D.C. Act 13-138, §§ 2 & 3 (Sept. 20, 1999) (providing that such individuals do not violate the District of Columbia Uniform Controlled Substances Act). Although D.C. voters passed this initiative in 1998, Congress blocked its implementation through an appropriations provision known as the Barr Amendment, as noted earlier. *See* Consolidated Appropriations Act of 2000, Pub. L. No. 106-113, § 167(b), 113 Stat. 1501, 1530 (1999) ("Initiative 59 . . . shall not take effect."); Comment, *Seeking a Second Opinion: How to Cure Maryland's Medical Marijuana Law*, 40 U. Balt. L. Rev. 139, 149 n.61 (2010) (describing the history of the Barr Amendment). Congress reenacted the Barr Amendment every year thereafter until 2009, when

it passed an appropriations bill without the Barr Amendment language. *See* Consolidated Appropriations Act of 2010, Pub. L. No. 111-117, 123 Stat. 334 (2009). Soon afterward, the D.C. Council approved implementation of Initiative 59, *see* D.C. Act 18-210 (June 4, 2010), and Congress did not pass any joint resolution of disapproval, thus allowing the initiative to take effect. *See Marijuana Policy Project v. United States*, 304 F.3d 82, 83 (D.C. Cir. 2002) ("D.C. Council enactments become law only if Congress declines to pass a joint resolution of disapproval within thirty days.").

**[8]** The plaintiffs argue that these congressional actions amount to "other provisions of Federal law" that authorize their medical marijuana use under § 12210(d)(1). We disagree. By allowing Initiative 59 to take effect, Congress merely declined to stand in the way of D.C.'s efforts to suspend *local* penalties on medical marijuana use. It did not affirmatively authorize medical marijuana use for purposes of *federal* law, which continues unambiguously to prohibit such use.[12] *See* Webster's Third New International Dictionary 147 (2002) ("*Authorize* indicates endowing formally with a power or right to act."). Moreover, even if Congress' actions somehow implicitly authorized medical marijuana use *in the District of Columbia*, Congress in no way authorized the

---

[12]It is true, of course, that, because the District of Columbia is not sovereign, the D.C. Council's legislative power is derived from that of Congress. *See* U.S. Const. art. 1, § 8, cl. 17 ("Congress shall have Power . . . [t]o exercise exclusive Legislation in all Cases whatsoever, over . . . the Seat of the Government of the United States."); D.C. Code Ann. §§ 1-203.02, 1-204.04 (delegating some of Congress' legislative power to the District and enumerating the powers of the D.C. Council). But "[u]nlike most congressional enactments, the [D.C.] Code is a comprehensive set of laws equivalent to those enacted by state and local governments." *Key v. Doyle*, 434 U.S. 59, 68 n.13 (1977). D.C. Council enactments are therefore not "federal" laws in the usual sense. *See United States v. Weathers*, 493 F.3d 229, 236 (D.C. Cir. 2007) (distinguishing between counts charged "under federal law" and "under the D.C. Code"); *Foretich v. United States*, 351 F.3d 1198, 1205 (D.C. Cir. 2003) (referring to "criminal liability under both D.C. and federal law").

plaintiffs' medical marijuana use in *California*. Congress' actions therefore did not bring the plaintiffs' marijuana use within the § 12210(d)(1) exception.

**[9]** We also do not agree with the plaintiffs that "[e]qual protection . . . mandates" a different conclusion. Congress' decision not to block implementation of Initiative 59 did not result in the unequal treatment of District of Columbia and California residents. On the contrary, Congress' actions allow these jurisdictions to determine for themselves whether to suspend their *local* prohibitions on the use and distribution of marijuana for medical purposes. Local decriminalization notwithstanding, the unambiguous *federal* prohibitions on medical marijuana use set forth in the CSA continue to apply equally in both jurisdictions, as does the ADA's illegal drug exclusion. There is no unequal treatment, and thus no equal protection violation. *See Boos v. Barry*, 485 U.S. 312, 333 (1988) (remarking that a statute could only run afoul of the Equal Protection Clause if construed to generate unequal treatment).

We therefore reject the plaintiffs' argument that their use of medical marijuana was authorized by Congress when it allowed implementation of D.C.'s Initiative 59.

## CONCLUSION

We hold that doctor-recommended marijuana use permitted by state law, but prohibited by federal law, is an illegal use of drugs for purposes of the ADA, and that the plaintiffs' federally proscribed medical marijuana use therefore brings them within the ADA's illegal drug exclusion. This conclusion is not altered by recent congressional actions allowing the implementation of the District of Columbia's local medical marijuana initiative. The district court properly concluded that the plaintiffs' ADA challenge to the cities' efforts to close their medical marijuana collectives is unlikely to succeed on the merits. The district court therefore did not abuse its discre-

tion by denying preliminary injunctive relief. *See Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (describing the legal standard applicable to preliminary injunctive relief and the standard of review on appeal).[13]

The parties shall bear their own costs on appeal.

**AFFIRMED.**

---

BERZON, Circuit Judge, concurring in part and dissenting in part:

The statutory interpretation issue at the core of this case is an unusually tough one, as the majority opinion recognizes. Looking at the language of § 12210(d)(1) alone, I would come out where the majority does—concluding that the statute is ambiguous. But unlike the majority, I would not declare a near-draw. Instead, looking at the words alone, I would conclude that the plaintiffs have much the better reading, but not by enough to be comfortable that their interpretation is surely correct. Turning then to the legislative history, I would again declare the plaintiffs the winner, this time sufficiently, when combined with the language considerations, to adopt their interpretation, absent some very good reason otherwise. And I am decidedly not convinced that the majority's facile "trump" via the Controlled Substances Act ("CSA") works, because, among other reasons, the supposed tension relied upon does not exist.

---

[13]Because we conclude that the plaintiffs are not qualified individuals with a disability protected by the ADA, we do not reach Costa Mesa's alternative argument that the ADA does not require accommodation of a qualified individual's "misconduct." Likewise, because we conclude that the district court properly denied preliminary injunctive relief, we need not decide whether the Anti-Injunction Act would prohibit the court from enjoining Lake Forest from pursuing its state-court public nuisance action.

I therefore would not decide the case on the broad ground that medical marijuana users are not protected by the ADA in any circumstance. And although, in the end, I might well be inclined to agree with the result the majority reaches on the narrower basis that the particular claim made here is not cognizable, it is not appropriate at this juncture to reach that question. I therefore respectfully dissent.

## 1.  Statutory Text

At the heart of this case is § 12210(d)(1) of the ADA, which defines "illegal use of drugs" as

> the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act. Such term does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.

42 U.S.C. § 12210(d)(1). James and the other plaintiffs (collectively, "James") argue that the first clause of the second sentence carves out their marijuana use, which is under the supervision of a doctor and in compliance with California law. The Cities, on the other hand, read the statute as creating a single exception—for drug use authorized by the CSA—and argue that the first clause should be read as excepting drug use under supervision of a doctor only when that use complies with the CSA.

Although § 12210(d)(1) is not *entirely* clear, James has very much the better reading of the statutory language. In James's view, the phrases "use of a drug taken under supervision by a licensed health care professional" and "other uses authorized by the [CSA]" create *two different* exceptions, so that the ADA protects use of drugs under supervision of a doctor even when that use is not authorized by the CSA. If

Congress intended to carve out only drug use authorized by the CSA, after all, the entire first clause—"the use of a drug under supervision by a licensed health care professional"— would have been unnecessary.

### a.   The use of "other"

The Cities argue, and the district court held, that James's reading renders the word "other" redundant, since Congress could have more clearly and concisely conveyed the meaning of two distinct exceptions by leaving it out. Under this view, "other" indicates that the exception contained in the first clause, for uses supervised by a doctor, is meant to be a subset of the exception in the second clause, and is included only for clarification and emphasis. This interpretation would, oddly, prefer a minor redundancy—the word "other"— over a major one—the entire first phrase of the second sentence.

Moreover, the word "other" is not necessarily redundant at all. It *could* be read to indicate that use under supervision of a doctor is meant to be a category of uses entirely subsumed by the larger category of uses authorized by the CSA, but this is not the only possible interpretation. Put another way, omitting the word "other" entirely would certainly have compelled the reading James advances, but its presence does not invalidate her interpretation. There is, after all, a middle ground between these two readings: The two exceptions could be entirely separate categories of uses, or, as the Cities see them, entirely overlapping, with the former a subset of the latter. But the two clauses could also be seen as *partially* overlapping, with the group of uses supervised by a doctor partially included within the set of uses authorized by the CSA but also partially independent, encompassing in addition a set of uses not authorized by the CSA. This reading strikes me as the most sensible.

Under this interpretation, "other" is not redundant. Instead, it accurately reflects the overlap. Were the "other" not there,

the exception would have divided the relevant universe into two non-overlapping sets. Yet, in fact the CSA authorizes some (but not all) uses of "drugs taken under supervision of a licensed health care professional." The "other" serves to signal that there is no strict dichotomy between the two phrases, as the bulk of the CSA-authorized uses are within the broader set covered by the first phrase.[1]

### b.   The use of a comma

There is also a third clause, "or other provisions of Federal law." The CSA is clearly a provision of Federal law, meaning that this second "other" is being used to indicate that "uses authorized by the [CSA]" is a subset of "provisions of Federal law." The Cities argue that Congress used the first "other" in the same way, suggesting a kind of three-colored bull's eye, in which use supervised by a doctor is a subset of use authorized by the CSA, which in turn is a subset of use authorized by Federal law.

This argument runs aground of the last antecedent principle to which the majority refers, Maj. Op. at 13067-68 n.7 (citing *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)); *see also Jama v. ICE*, 543 U.S. 335, 343 (2005); *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 832-33 (9th Cir. 1966). The rule states: "[A] limiting clause or phrase should ordinarily be read as modifying only the noun or phrase . . . that it immediately follows." *Jama*, 543 U.S. at 343. Justice Scalia's illustration in *Barnhart* is instructive:

> Consider, for example, the case of parents who, before leaving their teenage son alone in the house for the weekend, warn him, "You will be punished if you throw a party or engage in any other activity that damages the house." If the son nevertheless

---

[1]There is at least one CSA-authorized use that does not involve medical supervision. *See* 21 U.S.C. § 829(c).

> throws a party and is caught, he should hardly be able to avoid punishment by arguing that the house was not damaged.

*Barnhart*, 540 U.S. at 27. Notably, Justice Scalia's example has the word "other" in a similar role to that I posit here, and does not condemn it as redundant.

It is true, as the majority notes, that "The rule of the last antecedent . . . is not an absolute and can assuredly be overcome by other indicia of meaning." *United States v. Hayes*, 555 U.S. 415, 425 (2009) (internal quotation marks omitted). But here, the comma that separates the first and second clauses, as well as the grammatical infelicity of the syntax the Cities' interpretation posits, reinforce the application of the last antecedent principle. The disjunctive "or" separating the first two clauses after the comma suggests categories at least partially distinct, in contrast to the second use of "or," which is not preceded by a comma. The Cities' reading requires jumping over the comma, so that the phrase "authorized by the [CSA] or other provisions of Federal law" modifies "a drug taken under supervision by a licensed health care professional." But in the English language, modifiers at the ends of phrases do not usually leapfrog over commas. *See The Chicago Manual of Style* § 6.31 (16th ed. 2010) ("A dependent clause that follows a main clause should *not* be preceded by a comma if it is restrictive, that is, essential to the meaning of the main clause."). And here, ignoring the comma and tacking the modifier onto the phrase before the comma yields an exceedingly awkward—indeed, incoherent—locution: "such term does not include the use of a drug taken under supervision by a licensed health care professional . . . authorized by the [CSA] . . . ."

More sensibly, the comma was added to reinforce the understanding that the first phrase is complete in itself, while "uses" other than those under medical supervision must be authorized by federal law. The comma therefore indicates that

the set of uses described by the first clause is not entirely subsumed by the second clause, substituting for an implicit "if" in the second clause expressing this lack of total overlap. The sentence thus excepts (1) all supervised uses and (2) other uses as well, if authorized by the CSA or other federal law.

This reading of the statute is, on balance, considerably more persuasive as a matter of grammar and syntax than the reading advanced by the Cities. It minimizes the redundancy problem, accords with the last antecedent principle and the use of the word "other," avoids an awkward syntax, and accounts for the presence of the comma before "other uses."

## 2. Legislative History

James' reading of the statute also accords *much* better with the overall thrust of the legislative history. That history, while not *entirely* without ambiguity, strongly supports James's interpretation.

### a. Evolution of the exception

As the majority observes, Congress replaced a draft of the exception that required that use of drugs be "pursuant to a valid prescription," S. 933, 101st Cong. § 512(b), with the broader language eventually enacted. The original language provided that "[t]he term 'illegal drugs' does not mean the use of a controlled substance *pursuant to a valid prescription* or other uses authorized by the Controlled Substances Act or other provisions of Federal law," S. 933, 101st Cong. § 512(b) (as passed by the Senate, Sept. 7, 1989) (emphasis added), while the currently in force revision, adopted by the House in May of 1990 and ultimately chosen over the Senate version in conference, H.R. Rep. No. 101-596, at 5 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 565, 566, reads "[s]uch term does not include the use of a drug *taken under supervision by a licensed health care professional*, or other uses authorized by the Controlled Substances Act or other

provisions of federal law." 42 U.S.C. § 12210(d)(1) (emphasis added).

Critically, the House Committee Report restates the exception, once amended, in precisely the cumulative manner I have suggested most accords with the statutory language: "The term 'illegal use of drugs' does not include the use of controlled substances, including experimental drugs, taken under the supervision of a licensed health care professional. It also does not include uses authorized by the [CSA] or other provisions of Federal law." H.R. Rep. No. 101-485, pt. 3, at 75 (1990). This summary is in no way ambiguous, and indicates at least that members of the House familiar with the statutory language understood it in the manner that, for reasons I have explained, most accords with ordinary principles of grammar and syntax.[2]

---

[2]This is not the place to enter into the contemporary debates about the usefulness of legislative history in general, and of committee reports in particular. *Compare Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568 (2005) (Kennedy, J.) ("[J]udicial reliance on legislative materials like committee reports . . . may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history . . . .") *with id.* at 575-76 (Stevens, J., dissenting) ("[C]ommittee reports are normally considered the authoritative explication of a statute's text and purposes . . . .") (citing *Garcia v. United States*, 469 U.S. 70, 76 (1984)). Current Supreme Court precedent does permit consideration of both where a statute is ambiguous, as it is here. *See BedRoc Ltd. v. United States*, 541 U.S. 176, 187 n.8 (2004). Moreover, statements made in the course of legislative consideration are most useful where, as here, they do not in terms declare any interpretive or application precept. Such self-conscious declarations are indeed subject to manipulation by interest groups and may represent a backdoor way to establish principles that would have failed if included directly in the statute. *See Exxon Mobil*, 545 U.S. at 568. But statutory interpretation is aided rather than impeded by such clues as one can find in the legislative materials concerning how the legislators considering the bill were *speaking* about the statute at hand. Ambiguous language can take on a more definite meaning in a particular milieu. As a result, that sensitivity to the use of language while the bill is being considered can illuminate apparent imprecisions in the later-enacted statute. Pursuit of such a clarification is, to my mind, the appropriate use of the bill sequence, hearings, and Committee report on which I here rely.

### b.   Congressional awareness of medical marijuana

The majority discounts any significance in the way the current language is described in the relevant Committee report, observing that California voters did not pass Prop. 215 until 1996 and that there were no state laws in 1990 allowing for professionally supervised use of drugs in a manner inconsistent with the CSA. Congress would not have carefully drafted the exception to include non-CSA authorized medically supervised uses, the majority posits, as no such uses were legal under state law at the time.

That explanation for dismissing the best reading of the statute and the only coherent reading of the Committee's explanation of the statute won't wash, for several reasons. First, while California in 1996 became the first of the sixteen states that currently legalize medical marijuana, the history of medical marijuana goes back much further, so that use for medical purposes was not unthinkable in 1990. At one time, "almost all States . . . had exceptions making lawful, under specified conditions, possession of marihuana by . . . persons for whom the drug had been prescribed or to whom it had been given by an authorized medical person." *Leary v. United States*, 395 U.S. 6, 17 (1969). What's more, the Federal government itself conducted an experimental medical marijuana program from 1978 to 1992, and it continues to provide marijuana to the surviving participants. *See Conant v. Walters*, 309 F.3d 629, 648 (9th Cir. 2002). The existence of these programs indicates that medical marijuana was not a concept utterly foreign to Congress before 1996.

Second, a deeper look at the legislative history reveals that James's interpretation may well reflect the particular problem Congress was addressing when it enacted § 12210. Originally, the provision that became § 12210 did not exclude users of illegal drugs from the definition of protected disabled individuals. During hearings before the Committee on Labor and Human Resources, Senator Harkin, the sponsor of the ADA,

faced criticism that his bill would prevent employers from fir-
ing employees who were found to be under the influence of
drugs while at work and was therefore inconsistent with the
Drug-Free Workplace Act of 1988.[3] *Americans with Disabili-*
*ties Act of 1989: Hearing on S. 933 Before the S. Comm. on*
*Labor and Human Resources*, 101st Cong. 40 (1989).

In response, Senator Harkin pointed out that the provisions
of the ADA were modeled after Section 504 of the Rehabilita-
tion Act, and that his "intent was to incorporate the policies
in Section 504 as interpreted by the Supreme Court and the
Justice Department in a recent memo prepared by the Attor-
ney General." *Id.* That memorandum, which was inserted into
the record, explained that, in the view of the Justice Depart-
ment, "[a]ny legislation must make clear that the definition of
'handicap' does not include those who use *illegal* drugs." *Id.*
at 836. The memorandum went on to warn that

> [w]e . . . do not wish to penalize those persons who,
> in limited cases, are using 'controlled substances'
> such as marijuana or morphine under the supervision
> of medical professionals as part of a course of treat-
> ment, including, for example, experimental treatment
> or to relieve the side-effects of chemotherapy. These
> persons would fall under the same category as those
> who are users of legal drugs.

*Id.* at 837-38. During the subsequent debates in the Senate,
the amendment quoted above, which used the term "pursuant
to a valid prescription" and lacked the crucial comma, was
introduced by Senator Helms. 135 Cong. Rec. S10775 (Sept.
7, 1989). It was, as already explained, amended to include
language closer to that used in the Justice Department
Memorandum—"supervision of medical professionals."

---

[3]The Drug-Free Workplace Act requires that government contractors
ensure that their employees do not manufacture, distribute, dispense, pos-
sess, or use controlled substances at work. *See* 41 U.S.C. §§ 8101-8106.

A memorandum from the Justice Department certainly doesn't provide irrefutable proof of the correct interpretation of statutory text Congress had not yet adopted. But it does indicate that the issue of medical marijuana was at least on the federal government's, and Congress's, radar and not, as the majority would largely have it, an unforseen revolution six years in the future.

Further, as noted, the wording of the exception was altered in the House from the version that had earlier passed the Senate. The majority focuses on the substantive change from "pursuant to a valid prescription" to "taken under supervision by a licensed health care professional," noting that the CSA authorizes uses not pursuant to a prescription. But, for that very reason, there was no reason to change the wording of § 512(b) of the Senate bill; "other uses authorized by the [CSA]" were already, generically, covered. A more likely explanation, consistent with the House Committee Report, was the determination to define a set of uses covered by the exception *whether or not* "authorized by the [CSA]," a change carried out by the alteration in context, syntax, and punctuation—including the *addition* of the comma, otherwise inexplicable.

The upshot is that the statutory language and history, taken together, fit much better with James's version of what Congress meant than the Cities'.

## 3. Conflict with the CSA

The majority, however, instead declares a near-draw, and then breaks it by concluding that the Cities' "is the only interpretation that fully harmonizes the ADA and the CSA." Maj. Op. at 13072. Not only do I disagree with the notion that both interpretations of the statutory language and history are equally or almost equally viable, I also cannot buy the notion that judges may invent the manner in which the ADA and the CSA should be harmonized. As to users of illegal drugs, the

statute directly addresses that question. One way or another, we must find the answer to that harmonization by interpreting the statute, not by applying our own notion of how the two statutes ought to interact.

Moreover, I also cannot agree that James's reading of the exception creates a conflict between the ADA and the CSA so sharp as to provide useful guidance, from outside the terms of the ADA itself, as to the appropriate interaction of the two statutes. Nothing in the CSA addresses the civil rights of a disabled person using drugs for medical purposes, any more than anything in the CSA addresses whether such a person can recover in tort. Conversely, recognizing that individuals using CSA-covered drugs are not excluded from ADA coverage does not preclude prosecuting them under the CSA.

An analogous line of cases is instructive in this regard: In resolving conflicts between arbitrators' awards and notions of "public policy" gleaned from statutes, the Supreme Court has focused on direct and specific incompatibility, rather than on general notions concerning the underlying purpose of competing directives. *United Paperworkers International Union v. Misco*, 484 U.S. 29 (1987), and *Eastern Associated Coal Corporation v. United Mine Workers*, 531 U.S. 57 (2000), reviewed arbitration awards reinstating employees who had been discharged for marijuana use. The appropriate inquiry as to the validity of the arbitration awards, the Court noted, must be into "explicit conflict with other 'laws and legal precedents' rather than an assessment of 'general considerations of supposed public interests.' " *Misco*, 484 U.S. at 43 (quoting *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983)). Holding that no public policy against illegal drug use was sufficiently "explicit, well defined, and dominant," *United Mine Workers*, 531 U.S. at 62, to require that individuals who illegally use marijuana may not be employed, the Court stressed the idea that "the question to be answered is not whether [the employee's] drug use itself violates public policy, but whether the agreement to reinstate him does so."

*Id.* at 62-63; *see also Misco*, 484 U.S. at 44; *Southern Cal. Gas Co. v. Util. Workers Union Local 132*, 265 F.3d 787, 794-97 (9th Cir. 2001).

Similarly here, there could be no square conflict between the CSA and the ADA were the ADA interpreted, as I suggest, to specify that a medical marijuana user could be a qualified person with a disability and so not entirely excluded from the ADA's protection. The CSA does not make it illegal, for example, to employ a medical marijuana user or to provide such a user with schooling, unemployment benefits, or other non drug-related services. Interpreting the ADA to require, in some circumstances, such employment or schooling or benefits would not conflict with the CSA.

The California Supreme Court recently proceeded from a similar recognition as to the limits of the direct conflict concept, albeit to the opposite end. That Court held that the Compassionate Use Act did *not* dictate protection of medical marijuana users under the state's version of the ADA. The state disability statute, unlike the federal ADA, does not address, one way or the other, whether medical marijuana users are entitled to the protections of the statute. *Ross v. RagingWire Telecommunications Inc.,* 174 P.3d 200, 204 (Cal. 2008), held that under those circumstances, the fact that use of medical marijuana is not a criminal offense in California does not necessarily speak to its status under an anti-discrimination law. For the same reason, I suggest, the opposite is also true: that use of medical marijuana is a criminal offense under the CSA does not speak to its pertinence as a disqualifying factor with regard to the civil protections otherwise accorded disabled individuals.

There is, in other words, no direct conflict between the ADA and the CSA if the ADA is interpreted as I propose. An imagined conflict or tension should not be dragged in, like a deus ex machina, to settle a difficult statutory interpretation problem.

It is worth observing, in addition, that if there were a direct conflict, it would be the ADA rather than the CSA that would prevail, as the ADA is the later-enacted statute. Repeals by implication are disfavored; every effort must therefore be made to make both statutes operative within their realm, rather than declaring a clash. *Watt v. Alaska*, 451 U.S. 259, 267 (1981). Avoiding a clash by having the later statute bow to the earlier one, when the two address different problems and so can coexist without difficulty, is not harmonization, but hegemony through prior enactment.

Nor am I dissuaded by the assertion that my interpretation of the statutory exception "would allow a doctor to recommend the use of *any* controlled substance — including cocaine or heroin." Maj. Op. at 13074. The ADA does not address the practice of medicine. Section 12210 only excepts use pursuant to supervision by a "licensed health care professional." Nothing in California law, or, so far as I am aware, the law of any other state, permits doctors to encourage the use of heroin; a doctor who does so is unlikely to remain "licensed" for very long, and so the scenario is unlikely to occur. In contrast, California, which generally licenses medical professionals, does not penalize those who recommend medical marijuana, nor may the federal government do so, in many instances. *See Conant*, 309 F.3d at 639.

At the same time, I am dubious that the exception upon which James relies can ultimately carry the day in this case. We are concerned here with the Cities' effort to exclude medical marijuana dispensaries, not with a policy that prevents disabled individuals who use medical marijuana from, for example, attending school or obtaining unemployment benefits. The ADA's definition of "individual with a disability," excluding those who illegally "use" drugs, and its attendant definition of "illegal use of drugs," are both phrased in terms of "use," and do not address those who distribute or sell drugs.

The definition of "illegal use of drugs" applies equally to the ADA's employment provisions. See 42 U.S.C. § 12111(6). That exception, if read as I suggest, would preclude employers from refusing to hire otherwise qualified disabled individuals who use medical marijuana, as long as doing so did not interfere with their ability to carry out their duties safely. The legislative history quoted above suggests that Congress was particularly concerned with that group of individuals, recognizing that disabled individuals who follow their doctors' advice for dealing with their disability should not be barred from the workplace simply for doing so. But there is no connection between having a disability and distributing or selling drugs, and no preclusion in the ADA of refusing to hire drug dealers of any stripe.

Moreover, in the absence of any statutory provision addressing ADA protection for drug dealers, the mode of analysis the majority inappropriately applies to interpreting § 12210 would have more force. That is, absent any statutory provision addressing the intersection of the two statutes, it would be proper to hold that employers may ban from employment, and public entities may refuse to harbor within their borders, drug dealers who violate the CSA, as Congress in no way indicated otherwise. That was the mode of analysis adopted by the California Supreme Court in *Ross*, and which I suggest would apply under the ADA to the question whether Title II requires the Cities to allow the *distribution*—as opposed to the use—of medical marijuana.

Deciding that question is, however, premature at this juncture. The only basis on which the preliminary injunction was denied was the district court's conclusion that James was not within the group of disabled individuals protected by Title II of the ADA. For now, I would simply decide that question, holding that § 12210 does not exclude James and the other plaintiffs from the class of individuals protected by the ADA, and remand for further proceedings.

### 4.  Conclusion

While § 12210(d)(1) has a degree of ambiguity, it is most naturally read as carving out plaintiffs' medical marijuana use, which is "under supervision by a licensed health care professional," from the ADA's "illegal use of drugs" exception. The legislative history provides further support for this interpretation. At the same time, it seems most likely that Congress did not intend the ADA to require the Cities to permit marijuana dispensaries, which remain illegal under the CSA, within their borders, as the ADA provision at issue here is directed at personal use rather than distribution. I therefore dissent with regard to Part I of the majority opinion, and would remand for ultimate consideration on the merits of whether James has alleged a viable cause of action with regard to the *distribution* of drugs that are illegal under the CSA. I concur in the remainder of the majority opinion.