**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FIRST AMENDMENT COALITION,
*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

*Defendant-Appellee.*

No. 15-15117

D.C. No.
4:12-cv-01013-CW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted December 15, 2016
San Francisco, California

Filed August 25, 2017
Amended November 29, 2017

Before: Marsha S. Berzon and Mary H. Murguia, Circuit
Judges, and Frederic Block,* District Judge.

Order;
Opinion by Judge Block;

---

*The Honorable Frederic Block, Senior District Judge for the Eastern District of New York, sitting by designation.

Concurrence by Judge Berzon;
Concurrence by Judge Murguia

### SUMMARY[**]

**Attorney's Fees**

The panel reversed the district court's denial of the First Amendment Coalition's request for attorney's fees under the Freedom of Information Act ("FOIA").

The panel unanimously held – albeit for three different reasons – that the First Amendment Coalition was eligible for attorney's fees and remanded solely for the district court to determine the fees to which the First Amendment Coalition was entitled.

Judge Block, in the lead opinion, first held that there had to be a causal connection between the litigation and the voluntary disclosure of the memorandum in this Freedom of Information Act ("FOIA") litigation. In her concurring opinion, Judge Murguia agreed, but in her concurring opinion, Judge Berzon disagreed, believing that under the FOIA statute causation was not required.

Judge Block next held that reversal was required because the district court, in denying fees, employed an incorrect legal standard because it failed to consider and apply the factors set forth in *Church of Scientology v. United States Postal*

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Serv., 700 F.2d 486 (9th Cir. 1983). Judge Murguia disagreed with this part of Judge Block's opinion because the factual finding which the district court made was not clearly erroneous, but nonetheless held that fees were warranted under the facts of this case. Judge Berzon believed that fees were recoverable simply because there was no causation requirement.

## COUNSEL

Jonathan L. Segal (argued), Davis Wright Tremaine LLP, Los Angeles, California; Diana Palacios and Thomas R. Burke, Davis Wright Tremaine LLP, San Francisco, California; for Plaintiff-Appellant.

Sushma Soni (argued) and Sharon Swingle, Attorneys; Douglas N. Letter, Director, Appellate Staff; Hashim M. Mooppan, Deputy Assistant Attorney General; Chad A. Readler, Acting Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendant-Appellee.

Bruce D. Brown, Katie Townsend, and Adam A. Marshall, Washington, D.C., as and for Amicus Curiae Reporters Committee for Freedom of the Press.

## ORDER

The opinion filed on August 25, 2017, and published at 869 F.3d 868, is amended as follows:

On page 49 of the slip opinion, within Judge Murguia's opinion concurring in part and concurring in the judgment, add a footnote after the sentence "First Amendment Coalition failed to prevail primarily because of unilateral Government actions, outside its control." The footnote—new footnote four—reads: "In her opinion, Judge Berzon suggests that my reasoning implies bad faith on the part of the government in this case. I am not aware of the circumstances surrounding the DOJ's action, but the fact that the district court was not made aware of the White paper's disclosure was critical for

First Amendment Coalition's inability to prevail on the merits and establish eligibility for attorney fees."

With this amendment, Defendant-Appellee's motion to amend the opinion and stay the mandate (Docket Entry No. 57) is **DENIED** as moot.

---

**OPINION**

BLOCK, District Judge:

In September 2011, Anwar al-Awlaki,[1] an American citizen who had been targeted by the Central Intelligence Agency ("CIA") as a terrorist, was killed in a drone attack in Yemen. This spawned parallel litigations under the Freedom of Information Act ("FOIA") for the release of legal memoranda prepared by the Department of Justice's ("DOJ") Office of Legal Counsel ("OLC") addressing the legality of the targeted killing of U.S. citizen terrorists. Plaintiff-appellant First Amendment Coalition ("FAC") sued in the Northern District of California ("NDCA"), while—in consolidated litigation—the American Civil Liberties Union ("ACLU") and the New York Times ("NY Times") sued in the Southern District of New York ("SDNY").

After the SDNY granted summary judgment in the Government's favor, the Second Circuit reversed and ordered the release of one responsive OLC memorandum ("OLC-

---

[1] This spelling is used by the district court and in the parties' briefs. We adopt it, except in some quotations in which the name is spelled "al-Aulaqi" or "al-Aulaki."

DOD memo"). Thereafter, the DOJ disclosed a second responsive memorandum ("OLC-CIA memo") in the NDCA litigation. Nonetheless, the district court denied FAC's request for attorney's fees under FOIA.

We all agree—although for different reasons—that FAC is eligible for attorney's fees. Accordingly, we REVERSE and REMAND to the district court to determine the fees to which FAC is entitled.[2]

# I

More than a year prior to al-Awlaki's death, two NY Times reporters, Scott Shane and Charlie Savage, submitted separate FOIA requests to OLC. Shane's request, submitted in June 2010, sought "all Office of Legal Counsel opinions or memoranda since 2001 that address the legal status of targeted killings, assassinations, or killing of people suspected of ties to Al-Qaeda or other terrorist groups by employees or contractors of the United States government." *New York Times v. United States Dep't of Justice*, 756 F.3d 100, 105 (2d Cir. 2014).

Savage's request, submitted in October 2010, sought "a copy of all Office of Legal Counsel memorandum analyzing the circumstances under which it would be lawful for United States Armed Forces or intelligence community assets to target for killing a United States citizen who is deemed to be a terrorist." *Id*.

---

[2] A determination of eligibility "does not automatically entitle the plaintiff to attorney's fees." *Church of Scientology v. United States Postal Serv.*,700 F.2d 486, 489 (9th Cir. 1983). "Entitlement to attorney's fees is left to the discretion of the district court." *Id.*

FAC was the first to file a FOIA request after al-Awlaki's death. On October 5, 2011, it asked the DOJ for "a legal memorandum prepared by OLC concerning the legality of the lethal targeting of Anwar al-Awlaki, an American-born radical cleric who, according to federal government officials, was killed September 30, 2011 in a U.S. drone strike in Yemen." FAC alleged that "[t]he memorandum was the subject of a story ('Secret U.S. memo sanctioning killing of Aulaqi') in the September 30, 2011 Washington Post, in which multiple (albeit unnamed) administration officials discussed the memorandum and internal government debates on the legal issues addressed in it."

Two days later, on October 7, 2011, the NY Times made another FOIA request, identical to the Savage request, and twelve days later, on October 19, 2011, the ACLU submitted FOIA requests to three agencies—DOJ, the Department of Defense ("DOD"), and the CIA—seeking various documents concerning the targeted killings of United States citizens in general, and al-Awlaki, his son, and another American citizen, Samir Khan, in particular.

All FOIA requests were met with resistance by the agencies; they were the subject of either a so-called "no number, no list" response or a so-called *Glomar* response.[3] Not surprisingly, FAC, the NY Times, and the ACLU sued. The NY Times was the first to strike. It initiated its action in the SDNY on December 20, 2011; the ACLU brought suit,

---

[3] "A number, no list response acknowledges the existence of documents responsive to the request, but neither numbers nor identifies them by title or description." *New York Times*, 756 F.3d at 105. A *Glomar* response "neither confirms nor denies the existence of documents pertaining to the request." *Id.*

also in the SDNY, on February 1, 2012, and the two cases were consolidated. FAC commenced its lawsuit in the NDCA later that month, on February 29, 2012.

On June 21, 2013, the DOJ issued a modified response to FAC's FOIA request, "acknowledging the existence of one responsive OLC opinion pertaining to the Department of Defense"—the OLC-DOD Memo—but "refusing to confirm or deny the existence of responsive records related to any other agency." A similar acknowledgment had previously been made a year before in the SDNY litigation by the OLC, DOD, and CIA.[4] *See New York Times*, 756 F.3d at 108; *see also New York Times v. United States Dep't of Justice*, 915 F. Supp. 2d 508, 519 (S.D.N.Y. 2013) (citing Declaration of John E. Bies, Deputy Assistant Attorney General, ¶ 30 ("Bies Decl.")); Declaration of Robert E. Neller, Lt. General, United States Marine Corps, Director of Operations for the Joint Staff at the Pentagon, ¶ 17 ("Neller Decl.")). The OLC-DOD Memo was an "OLC opinion pertaining to the Department of Defense marked classified . . .[t]hat . . . contain[ed] confidential legal advice to the Attorney General, for his use in interagency deliberations, regarding a potential military

---

[4] Unlike the NY Times and FAC, which only submitted FOIA requests to the OLC, the "ACLU submitted FOIA requests to three agencies: DOJ (including two of DOJ's component agencies, [the Office of Information Policy] and OLC), DOD, and CIA." *New York Times*, 756 F.3d at 106. Therefore, each agency was responsible for responding to the ACLU's request, and all three "modified their original responses in light of statements by senior Executive Branch officials on the legal and policy issues pertaining to United States counterterrorism operations and the potential use of lethal force by the United States Government against senior operational leaders of al-Qaeda who are United States citizens." *Id.* at 105–07.

operation in a foreign country." *New York Times*, 756 F.3d at 112 (citing Bies Decl. ¶ 30).

Despite acknowledging its existence, the Government refused to disclose the OLC-DOD memo—as well as any other related documents—in both litigations, claiming an assortment of FOIA exemptions and privileges.[5] Each district court granted the Government's summary judgment motions. The SDNY decision came first, on January 3, 2013, and the NY Times and ACLU appealed to the Second Circuit. The NDCA decision came more than a year later, on April 11, 2014, while the Second Circuit appeal was *sub judice*.

In between the SDNY and NDCA decisions, there were a number of public disclosures that subsequently impacted the Second Circuit's decision. As recounted by the circuit court,

> [a]fter the [SDNY] entered judgment for the Defendants, one document and several statements of Government officials . . . became publicly available. The document was captioned "DOJ White Paper" and titled "Lawfulness of a Lethal Operation Directed Against a U.S. Citizen Who Is a Senior

---

[5] In the SDNY action, the Government submitted *Vaughn* indices—filings identifying records withheld with explanations for why they were withheld—which identified unclassified documents, such as "an e-mail chain reflecting internal deliberations concerning the legal basis for the use of lethal force against United States citizens in a foreign country in certain circumstances" and "e-mail traffic regarding drafts of the speech given by [Jeh] Johnson at Yale Law School and a speech delivered by Attorney General Holder at Northwestern University School of Law." *New York Times*, 756 F.3d at 107.

Operational Leader of Al-Qaeda or an Associated Force"

("White Paper").[6] *New York Times*, 756 F.3d at 110. In the White Paper "the Government ma[de] public a detailed analysis of nearly all the legal reasoning contained in the OLC-DOD Memo," which the Second Circuit had reviewed in camera. *Id.* at 116. As the circuit court noted, the White Paper had been "leaked to the press" on February 4, 2013—soon after the SDNY granted summary judgment for defendants—and it was subsequently "officially disclosed" four days later by the Office of Information Policy "in response to a FOIA request submitted by Truthout," a non-profit political news organization. *Id.* at 110 n.9, 116.

Based upon the release of the White Paper and the Government officials' statements, the Second Circuit concluded that "waiver of secrecy and privilege as to the legal analysis in the [OLC-DOD Memo] ha[d] occurred." *Id.* It accordingly ordered, *inter alia*, the disclosure of a redacted version of the OLC-DOD Memo, and submission to the district court of "other legal memoranda prepared by OLC . . .

---

[6] The "several statements of Government officials" to which the Second Circuit refers include John O. Brennan, "testifying before the Senate Select Committee on Intelligence on February 7, 2013, on his nomination to be director of CIA, [who] said, among other things, 'The Office of Legal Counsel advice establishes the legal boundaries within which we can operate.'" *New York Times*, 756 F.3d at 111 (quoting *Open Hearing on the Nomination of John O. Brennan to be Director of the Central Intelligence Agency Before the S. Select Comm. on Intelligence*, 113 Cong. 57 (Feb. 7, 2013)). They also include a May 2013 letter Attorney General Eric Holder wrote to Senator Patrick J. Leahy, Chairman of the Senate Judiciary Committee, in which Holder stated that "[t]he decision to target Anwar al-Aulaki was lawful . . . ." *Id.*

for in camera inspection and determination of waiver of privileges and appropriate redaction."[7]  *Id.* at 124.

In so holding, the Second Circuit paused to distinguish the NDCA's decision denying FAC's FOIA request for the OLC-DOD memo, even though that decision—unlike the SDNY's—was rendered after the White Paper had surfaced. It believed that the NDCA had been "under the impression that there ha[d] been no official disclosure of the White Paper," and therefore, "did not assess its significance," whereas before the circuit court, "the Government ha[d] conceded that the White Paper, with its detailed analysis of

---

[7] On June 30, 2014, in response to the Second Circuit's mandate, Judge McMahon—the presiding SDNY judge—ordered the Government to disclose for in camera review "[u]nredacted copies of the 'other legal memoranda prepared by OLC and at issue here'" within twenty-one days of the order.  New York Times v. United States Dep't of Justice, No. 11-9336 (S.D.N.Y. June 30, 2014) (order instituting circuit court mandate) (citing *New York Times*, 756 F.3d at 124).  On July 9, 2014, Judge McMahon approved "a short postponement of the date by which the Government must produce the documents contemplated by the mandate" to August 15, 2014.  *New York Times v. United States Dep't of Justice*, No. 11-9336 (S.D.N.Y. July 9, 2014) (order approving postponement of in camera lodging).  The procedure for the in camera review "g[ave] the Government an opportunity to explain, under seal and in camera, why it ha[d] not waived potentially applicable privileges . . . ."  *Id.*

legal reasoning, ha[d] in fact been officially disclosed."**[8]** *New York Times*, 756 F.3d at 116.

Not surprisingly, FAC sought to vacate—by a timely motion for reconsideration—the NDCA's order granting the DOJ's motion for summary judgment. It also moved for attorney's fees and costs.

The district court directed that before the Government filed its response to FAC's motion, the parties should "meet and discuss whether the Second Circuit's order that the DOJ disclose the OLC-DOD memorandum mooted the instant case." Thereafter, on August 28, 2014, the parties submitted a joint status report, stating that "[o]n August 15, 2014, Defendant United States Department of Justice ("Defendant")

---

**[8]** The Second Circuit's effort to distinguish the NDCA's failure to order the release of the OLC-DOD memo because it believed that the district court was of the "impression" that it was not officially disclosed was charitable since, in addition to being officially disclosed to Truthout, the White Paper was also disclosed to the Senate Judiciary Committee, Senate Select Intelligence Committee, House Judiciary Committee, and House Permanent Select Committee on Intelligence. Morever, in its memorandum in opposition to the Government's summary judgment motion, FAC expressly advised the district court of the release of the White Paper and the various prior statements of the Government officials. *See* Pl. Opp. to MSJ at 2–4, 12, 21, First Amendment Coalition v. United States Dep't of Justice (N.D.C.A. 2013) (No. 12-1013). The memorandum was filed on October 3, 2013, six months prior to the NDCA's decision of April 11, 2014, granting the Government's motion and dismissing the complaint. Specifically, FAC told the court that when it was released, "the President's spokesman confirmed that the White Paper was authentic, that it was the official position of the Government, and that it was adapted from classified memoranda which had been provided to Congress." *Id.* at 3. The memorandum also alluded to the fact that the White Paper "along with copious other pieces of official evidence" had previously "been submitted to the [district court.]" *Id.* at 4.

released to Plaintiff First Amendment Coalition ("Plaintiff") *a second memorandum* pertaining to a contemplated CIA operation against Anwar al-Aulaqi." Joint Status Report at 2, First Amendment Coalition v. United States Dep't of Justice (N.D.C.A. 2014) (No. 12-1013) (emphasis added).[9]  This second memorandum ("OLC-CIA memo") was largely redacted but had concluded, as had the OLC-DOD memo, that "we do not believe the Constitution prohibits the proposed lethal action" that was being contemplated against al-Awlaki.  Both memoranda were addressed to the Attorney General, but differed in two respects: The OLC-DOD memo, written on July 16, 2010, discussed the legality, under both the Constitution *and* federal criminal laws, of lethal operations by the DOD *and* CIA against al-Awlaki. The OLC-CIA memo was written on February 19, 2010, six months earlier, and discussed *only* the constitutionality of lethal operations by the CIA against al-Awlaki.

The parties agreed that "these disclosures resolved all substantive disputes in the case," but "disagreed regarding whether the Court should vacate its summary judgment order and whether Plaintiff is entitled to attorneys' fees."

The district court vacated its summary judgment order, but held that based upon the parties' concession that "no substantive issues remain," the case had been rendered moot

---

[9] Deputy Assistant Attorney General Bies stated, in a written declaration, that the Government also released on August 15, 2014 a redacted version of the OLC-CIA memo to the NY Times and ACLU "consistent with a court order from the [SDNY]," notwithstanding the SDNY's order that all documents be submitted in camera.  Since the Government publicly disclosed the OLC-CIA memo in the NDCA litigation, there was obviously no longer a reason to submit it for in camera review.

since the parties had decided "to abandon their right to review." In so holding, the court reasoned that "Plaintiff abandoned its right to pursue its motion for reconsideration, to appeal this Court's summary judgment order and to challenge the redactions to the OLC-DOD memorandum and the CIA memorandum." And as for the defendant, "[n]ot only did the government abandon its right to seek en banc review in the Second Circuit or to file a petition for a writ of certiorari, *it voluntarily disclosed the CIA memorandum to Plaintiff in this case . . . .*" (emphasis added). The district court then denied FAC's motion for attorney's fees because "Defendant in this case released the documents largely as a result of the Second Circuit's ruling in *NY Times*, not as a result of the ruling in this case."

This appeal followed.[10]

## II

"Because an award of fees under [FOIA] is discretionary, we review for an abuse of discretion. A trial court abuses its discretion when its decision is based on clearly erroneous factual findings or an incorrect legal standard." *United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., Local 598 v. Dep't of Army Corps of Engineers*,

---

[10] In oral argument before this panel, Jonathan Segal, counsel for appellant, disclosed confidential information related to offers made by his opponent in mediation before the Ninth Circuit Mediation Program. This is in clear violation of Ninth Circuit Rule 33-1(c)(4), which states that any written or oral communication made in Ninth Circuit Mediation Program settlement discussions may not be disclosed to anyone who is not a participant in the mediation. The panel reiterates the importance of maintaining confidentiality in the Ninth Circuit Mediation Program. The wrongfully disclosed information was not considered in deciding the case.

841 F.2d 1459, 1461 (9th Cir. 1988) (abrogated on other grounds by *United States Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749 (1989)) (citations omitted).

FOIA was enacted in 1966. "Without question, the Act is broadly conceived.  It seeks to permit access to official information long shielded unnecessarily from public view . . . ." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). In other words, "the statute's goal is 'broad disclosure,' and the exemptions [to disclosure] must be 'given a narrow compass.'" *Milner v. Dep't of Navy*, 562 U.S. 562 (2011) (quoting *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989)).

Congress passed substantial amendments in 1974, among them an attorney's fees provision awarding fees and costs to a FOIA plaintiff who had "substantially prevailed."  1974 Amendment to the Freedom of Information Act, Pub. L. No. 93-502, 88 Stat. 1561.  The fees provision "has as its fundamental purpose the facilitation of citizen access to the courts to vindicate the public's statutory rights," and "'a grudging application' of the attorney fees provision 'would be clearly contrary to congressional intent.'" *Exner v. Fed. Bureau of Investigation*, 443 F. Supp. 1349, 1351 (S.D. Cal. 1978) (citing *Nationwide Building Maintenance, Inc. v. Sampson*, 559 F.2d 704, 715 (D.C. Cir. 1977)), *aff'd* 612 F.2d 1202 (9th Cir. 1980). In keeping with FOIA's broad reach, the statute contemplates that there may well be parallel litigation in different venues. *See Taylor v. Sturgell*, 553 U.S. 880, 903 (2008); *see also Smith v. Bayer Corp.*, 564 U.S. 299, 317 (2011).

Congress did not provide any context to the cryptic "substantially prevailed" standard, but decisional law did. In *Church of Scientology*, we explained:

> To be eligible for an award of attorney's fees in a FOIA suit, the plaintiff must present convincing evidence that two threshold conditions have been satisfied. The plaintiff must show that: (1) the filing of the action could reasonably have been regarded as necessary to obtain the information; and (2) the filing of the action had a *substantial causative* effect on the delivery of the information.

700 F.2d at 489.

Although we did not specifically employ the word "catalyst," we remanded to the district court to assess whether the plaintiff had substantially prevailed—and therefore was eligible for attorney's fees—in light of the disclosure of a number of documents during the course of litigation before the complaint was dismissed. *Church of Scientology*, therefore, represented a "catalyst theory of recovery"; namely, an "alternate theory for determining the prevailing party if no relief on the merits is obtained." *Kilgour v. City of Pasadena*, 53 F.3d 1007, 1010, *as modified on denial of reh'g* (9th Cir. 1995). Thereafter, the catalyst theory was, for a number of years, consistently applied in FOIA fee award cases within the Ninth Circuit, and was similarly employed by our sister circuits both before and after *Church of Scientology*. *See, e.g.*, *Long v. I.R.S.*, 932 F.2d 1309 (9th Cir. 1991) (reciting *Church of Scientology* standard); *Nationwide Bldg. Maint. Inc. v. Sampson*, 559 F.2d 704 (D.C. Cir. 1977);

*Maynard v. C.I.A.*, 986 F.2d 547 (1st Cir. 1993); *Vermont Low Income Advocacy Council v. Usery*, 546 F.2d 509 (2d Cir. 1976);[11] *Cazalas v. United States Dep't of Justice*, 660 F.2d 612 (5th Cir. 1981); *Clarkson v. I.R.S.*, 678 F.2d 1368 (11th Cir. 1982).

In 2001, however, the Supreme Court rejected the application of the catalyst theory to the recovery of attorney's fees under the Fair Housing Amendments Act and the Americans with Disabilities Act, holding that the theory would impermissibly "allow[] an award where there is no judicially sanctioned change in the legal relationship of the parties."  *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't. of Health & Human Res.*, 532 U.S. 598, 605 (2001).  We then held, in *Oregon Nat. Desert Ass'n v. Locke*, 572 F.3d 610, 614 (9th Cir. 2009), that *Buckhannon*, by analogy, would also apply to FOIA and, therefore, abrogated our decision in *Church of Scientology*.  But, as we explained in *Locke*, in 2007 Congress "modified FOIA's provision for the recovery of attorney fees to ensure that FOIA complainants who relied on the catalyst theory to obtain an award of attorney fees would not be subject to the *Buckhannon* proscription."  *Id.* at 615.  Since then, the FOIA attorney's fees statute has read:

> (i) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any

---

[11] The district court in *Exner* embraced the catalyst theory language in *Vermont Low Income*, 443 F. Supp at 1353.  We conclusorily affirmed the result, simply commenting that "[t]he record supports both the findings and the court's conclusion," *Exner*, 612 F.2d at 1207, but did not, until *Church of Scientology*, specifically adopt and apply the catalyst theory.

case under this section in which the complainant has substantially prevailed.

(ii) For purposes of this subsection, a complainant has substantially prevailed if the complainant has obtained relief through either – (I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

5 U.S.C. § 552(a)(4)(E).

Subsection (E)(i) is identical to FOIA's earlier fee award provision. But subsection E(ii)(II), relevant to this appeal, expressly allows recovery based on "a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial."[12]

As we further explained in *Locke*, this new provision "addresse[d] a relatively new concern that, under [the prior statute], Federal agencies ha[d] an incentive to delay compliance with FOIA requests until just before a court decision [was] made that [was] favorable to a FOIA requester." *Id.* (quoting 153 Cong. Rec. S15701-04 (daily ed. Dec. 14, 2007) (statement of Sen. Leahy, sponsor of the 2007 Amendments)).  Section E(ii)(II) was designed to clarify, therefore, "that *Buckhannon* does not apply to FOIA cases," since under that provision, "a FOIA requester can obtain attorney's fees when he or she files a lawsuit to obtain

---

[12] The Government appropriately concedes that FAC's claim was not insubstantial.

records from the Government and the Government releases those records before the court orders them to do so." *Id.*

We have not had an opportunity since the passage of the 2007 amendment to decide whether it restores the causation standard under the catalyst theory applied in *Church of Scientology.* But six circuit courts to have addressed the impact of the amendment have held that it simply reinstated the pre-*Buckhannon* catalyst theory of recovery. *See Brayton v. Office of the United States Trade Representative*, 641 F.3d 521 (D.C. Cir. 2011); *Warren v. Colvin*, 744 F.3d 841 (2d Cir. 2014)*; Havemann v. Colvin*, 537 Fed. Appx. 142 (4th Cir. 2013); *Batton v. I.R.S.*, 718 F.3d 522 (5th Cir. 2013); *Cornucopia Institute v. United States Dep't of Agriculture*, 560 F.3d 673 (7th Cir. 2009); *Zarcon, Inc. v. N.L.R.B.*, 578 F.3d 892 (8th Cir. 2009). In doing so, they have implicitly rejected the notion that subsection E(ii)(II) should be construed literally to allow for the recovery of attorney's fees without the need to establish causation once there is a voluntary disclosure or change in position subsequent to the initiation of FOIA litigation.

Judge Murguia and I believe that we should join our sister circuits in holding that, under the catalyst theory, there still must be a causal nexus between the litigation and the voluntary disclosure or change in position by the Government. Thus, the plaintiff in this case had to present "convincing evidence" that the filing of the action "had a substantial causative effect on the delivery of the information." *Church of Scientology*, 700 F.2d at 489.[13]

---

[13] Notably, although we are not bound by their view of the law, the parties agree that the *Church of Scientology* causation standard applies, although they, of course, disagree as to its application in the present case.

In doing so we explicitly reject the notion that the 2007 amendment eliminated the need to establish causation once a lawsuit has been initiated. The statute cannot plausibly be read that way. There may be a host of reasons why the Government has voluntarily released information after the filing of a FOIA lawsuit. One obvious example is that previously classified information may have subsequently become unclassified for reasons having nothing to do with the litigation, or "administrative compliance with statutory production requirements, rather than. . . [the] FOIA suit triggered the release of the bulk of the documents." *Van Strum v. Thomas*, No. 88-4153, 1989 WL 90175, at \*1 (9th Cir. Aug. 2, 1989). Thus, as we recognized in *Church of Scientology*, while it is true that "the mere fact that defendants have *voluntarily* released documents does not preclude an award of attorney's fees to the plaintiff," it is equally true that "the mere fact that information sought was not released until after the lawsuit was instituted is insufficient to establish that a complainant has 'substantially prevailed.'" 700 F.2d at 491–92 (citing with approval *Cox v. United States Dep't of Justice*, 601 F.2d 1, 6 (D.C. Cir. 1979)).[14]

## III

In *Church of Scientology* we remanded to the district court to make factual findings regarding three factors which

---

[14] It is difficult to conceptually square Judge Berzon's opinion that causation is irrelevant with the reality that the bringing of the litigation *was itself a cause* for what subsequently occurred. Causation, therefore, is very much in play, requiring the plaintiff to establish under the plain reading of the statute—both before and after the amendment—that it thereafter "substantially prevailed."

a court should consider in determining whether the plaintiff had substantially prevailed: (1) "when the documents were released," (2) "what actually triggered the documents' release," and (3) "whether [the plaintiff] was entitled to the documents at an earlier time." *Id.* at 492.

Unlike *Church of Scientology*, there is no need to remand to determine eligibility since the undisputed material facts meet those criteria.[15]  *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982) (citing *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 331–332 (1974)) ("[A] remand is the proper course *unless* the record permits only one resolution of the factual issue.  All of this is elementary." (emphasis added)).[16]

## A.  When the Document Was Released

The NDCA litigation spanned almost two and a half years, from its inception on February 29, 2012 until the OLC-CIA memo was released on August 15, 2014.  In *Church of Scientology* we embraced the district court's observation in *Exner* "that *when* information is delivered may be as important as *what* information is delivered."  700 F.2d at 490

---

[15] There may be other factors in a given case that may be relevant to whether the plaintiff had substantially prevailed, but these three factors clearly suffice in the present case.

[16] Judge Murguia does not join in Part III because she "do[es] not agree that the district court clearly erred in its causation finding." Murguia Concurrence at 42.  But reversal is required whenever a district court employs "an incorrect legal standard," *United Ass'n of Journeymen*, 841 F.2d at 1461, and I believe, as explained in this Part, that the district court committed legal error in its cryptic causation conclusion by failing to recognize and apply the correct legal standard, namely the factors articulated in *Church of Scientology*.

(citing *Exner*, 443 F. Supp. at 1353). We also noted the district court's "support" in *Exner* for the requisite causal nexus "in that plaintiff faced formidable opposition by the government at every juncture," and "[i]t was unlikely, in the district court's view, that the action would have produced such favorable results, without the 'dogged determination' of plaintiff." *Id.*

The same can be said of the present case. FAC was met with abject resistance throughout the entire litigation until the OLC-CIA memo was produced roughly two and a half years after the lawsuit was initiated, and almost a year and seven months after the Government waived any secrecy or privilege with the official release of the White Paper.

**B.  What Actually Triggered the Document's Release**

There is no question that the Second Circuit's decision in the SDNY litigation was an impetus for FAC to continue its litigation. But what *actually triggered* the release of the OLC-CIA memo was that FAC sought to vacate the district court's grant of summary judgment. It was the appellant's "dogged determination," therefore, that led the district court to "direct" the parties to discuss whether the litigation was moot, and which resulted in the Government's decision—as acknowledged by the lower court—to "voluntarily disclose[] the CIA memorandum to [FAC]." Because of FAC's efforts, the public then learned that the OLC-DOD memo was not the first memo addressing the justification for the drone attack, nor was it identical to the prior OLC-CIA memo. Plaintiff's litigation, therefore, "triggered the release of additional or key documents." *Van Strum*, 1989 WL 90175, at *1.

### C.  Whether Plaintiff Was Entitled to the Document at an Earlier Time

There is no reason why the district court failed to recognize, as the Second Circuit did, that the official release of the White Paper—coupled with all the prior public statements of high-ranking Government officials— constituted a waiver of any secrecy and privilege that the Government had asserted.  The district court, therefore, erred in granting summary judgment and dismissing the complaint.  But for this error, the district court litigation would have ended earlier.  Thus, FAC had to endure unnecessarily protracted litigation.  It is counterintuitive to punish FAC for expending additional legal fees to pursue the litigation, when it would have sooner been entitled to the release of both memoranda—and the right to recoup its counsel fees—if not for the district court's error.

### IV

In sum, the district court abused its discretion when it failed to consider and apply the relevant factors that we articulated in *Church of Scientology* for determining whether FAC had substantially prevailed.  Its limited view of causation was at odds with *Church of Scientology*'s more enlightened view that, as here, multiple factors may be at play. It was, moreover, inconsistent with Congress' intent—once again—that the award of FOIA counsel fees "has as its fundamental purpose the facilitation of citizen access to the courts," and should not be subject to "a grudging application." *Exner*, 443 F. Supp. at 1351–52 (citing *Nationwide Building*, 559 F.2d at 715).

Since we have determined eligibility as a matter of law because there are no material facts in dispute, remand is required solely for the district court to determine the fees to which FAC is entitled.

**REVERSED and REMANDED.**

---

BERZON, Circuit Judge, concurring in the judgment:

I agree with the result reached by both of my colleagues. But I have a fundamental disagreement with both of them regarding the reach of the Freedom of Information Act (FOIA) fees provision, and so concur only in the judgment.[1]

Contrary to Judge Block's position, the text of the fees provision, 5 U.S.C. § 552(a)(4)(E), plainly does not require a causal nexus between the litigation and the agency's disclosure. It is inappropriate and impermissible to read one in, even though other courts have done so.

Judge Block represents that a majority of the panel holds that a FOIA plaintiff "ha[s] to" present evidence that the litigation had a "substantial causative effect" on the disclosure to be eligible for fees absent a judgment in her favor. Lead Op. at 19 (internal citations omitted); *see also id.* (reading other circuits' law to affirm "the *need* to establish causation" between the litigation and a voluntary agency disclosure for a plaintiff to be eligible for fees) (emphasis

---

[1] With the exception of footnote 10 of Judge Block's opinion, which I join.

added).[2]  Judge Murguia says that she concurs in this part of the lead opinion.  Concurring Op. at 42.  But the alternative theory of fee eligibility propounded in Judge Murguia's concurrence—which, as I shall explain, is as textually insupportable as the causal nexus requirement— necessitates neither a final judgment in favor of the plaintiff nor a showing of causation.  Because Judge Murguia and I, although for different reasons, would hold that even absent a judgment, causation is *not* always a necessary condition of fee eligibility for FOIA complainants, there is in fact no majority for the holding that causation has to be demonstrated.

# I

Our inquiry begins with the statute.  If the text is clear, as it is here, it ends there as well.  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).

A FOIA complainant is eligible for attorney fees if she has "substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(i).  A person has "substantially prevailed" if she "has obtained relief through either – (I) a judicial order . . . or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial."  *Id.* § 552(a)(4)(E)(ii).  We are concerned with subsection (II).

Parsing that subsection, it has three elements.  First, the complainant must have "obtained relief"; in this context, the requestor must have received from the agency some of the information she was suing for.  Second, the relief must have

---

[2] I will refer to Judge Block's opinion for the court as the "lead opinion."

been obtained through "a voluntary or unilateral change" in the agency's position.  This element contemplates the willing disclosure of information to the complainant by an agency, in contrast to one brought about by "judicial order" or "enforceable written agreement or consent decree," as envisioned in subsection (I).  Lastly, the claim must be "not insubstantial." *Id.*  No more, no less.  Conspicuously absent from Congress's definition of a "substantially prevailing" complainant is the existence of a "causal nexus between the litigation and the voluntary disclosure or change in position by the Government."  Lead Op. at 19.

Nor does the text of the applicable provision offer any language that could include a hidden causation requirement.

First, to "obtain relief" from an agency simply means to receive the information a requestor is seeking, whether that be documents, a *Vaughn* index, or a response acknowledging the existence of relevant documents.  The fact of relief does not relate to the impetus behind the agency's action.

The next element of the provision—"a voluntary or unilateral change in position by the agency"—if anything cuts *against* a reading that requires a "substantially prevailing" complainant to demonstrate causation.  "Voluntary" may mean "done without any present legal obligation" to do so, but in another sense it means "not constrained, impelled, or *influenced* by another."  Webster's Third New Int'l Dictionary 2499 (1971) (emphasis added).  A "unilateral" disclosure is one "done, made, undertaken, or shared by one of two or more persons or parties," *id.* at 2564, which includes actions taken by one party independently of the other.  These words, standing alone, indicate independent action *not* caused by the complainant's litigation.

The last stone to turn over—the "not insubstantial" element—yields no implicit causal nexus requirement, either. Whether a claim is "substantial," or "not insubstantial,"[3] bears on whether the claim has or may have merit. That the claim could have merit may well explain why the agency turned over the requested information after the lawsuit was filed. So the substantiality of the claim may serve as a proxy or substitute for causation (a notion borne out by the legislative history, discussed later). But it is not itself a causation requirement; substantiality is a different inquiry from motive or causation.

Those three elements are all a FOIA complainant needs to "substantially prevail[]" and thus be eligible for attorney fees.[4] This provision obviously embraces cases in which a requestor could demonstrate that the lawsuit *did* spur an agency's hand-over of documents before the case matures to judgment, but it extends equally to instances in which the agency decides to release the document for other reasons.

In short, Congress spelled out in detail the meaning of "substantially prevailed," but did not include any causation or motive requirement. We are not free to interpose one. "There is a basic difference between filling a gap left by

---

[3] "The double negative in the amendment was not my proposal and I accept no responsibility for that grammatical infraction." 153 Cong. Rec. S10,989 (daily ed. Aug. 3, 2007) (statement of Sen. Kyl).

[4] A complainant who is "eligible" for fees is not necessarily "entitled" to them; I am only concerned here with the effect of the statutory amendments on eligibility for fees. *See Or. Nat. Desert Ass'n v. Locke*, 572 F.3d 610, 614 (9th Cir. 2009) ("To obtain an award of attorney fees under the FOIA, a plaintiff must demonstrate both eligibility and entitlement to the award.").

Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (internal quotation marks and citations omitted). We may not read into this quite specific statute something that is not there. *See, e.g.*, *United States v. Ressam*, 553 U.S. 272, 273 (2008) (holding that a plain reading of "carrying an explosive 'during the commission of'" a felony foreclosed a relational requirement between the felony and the explosives).

## II

The lead opinion does not (and could not) locate the causal nexus requirement in the amended statutory text. Instead, it finds the causation requirement in cases pre-dating both *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001), and the statutory amendments to FOIA. *See* Lead Op. at 19–20 (citing *Church of Scientology v. U.S. Postal Serv.*, 700 F.2d 486, 489, 491–92 (9th Cir. 1983)).

As the lead opinion notes, Lead Op. at 17, *Buckhannon* was understood by this Court to foreclose attorney fees under the "catalyst theory" that had been embraced by most courts of appeals. *See Or. Nat. Desert Ass'n*, 572 F.3d at 616 (agreeing with two other circuits that *Buckhannon* applied to FOIA). *Oregon Natural Desert Association* also recognized that the 2007 FOIA amendments legislatively overruled *Buckhannon* with respect to attorney fees under FOIA.[5] *Id.* at 617.

---

[5] *Oregon Natural Desert Association* states that the statutory amendments reinstated the pre-*Buckhannon* catalyst theory, perhaps implying a causation requirement. 572 F.3d at 614–15. The statement to

Where I part ways with the lead opinion is in interpreting precisely what the statutory amendments did—specifically, *how* they overruled *Buckhannon*. The lead opinion represents that the amendments "simply reinstated the pre-*Buckhannon* catalyst theory of recovery," Lead Op. at 19, including the requirement of a causal nexus.    In adopting this characterization, the lead opinion is in good company—as it notes, several other circuits have assumed that the amendments restored the status quo ante. *See, e.g.*, *Summers v. U.S. Dep't of Justice*, 569 F.3d 500, 503 (D.C. Cir. 2009) ("Congress amended the FOIA to incorporate the catalyst theory."); *Batton v. IRS*, 718 F.3d 522, 525 (5th Cir. 2013) (construing the statutory amendments to "codif[y]" the catalyst theory, including the requirement that the litigation had a "substantive causative effect" on the disclosure); *Zarcon, Inc. v. NLRB*, 578 F.3d 892, 894 (8th Cir. 2009) (reading the statutory amendments to "definitively establish[] that the 'catalyst theory'" applies to attorney fees under FOIA).  These courts, like the lead opinion, have understood the amendments simply to effect an erasure of *Buckhannon* as applied to FOIA, reinstating the pre-*Buckhannon* case law that requires a causal nexus. *See, e.g.*, *Conservation Force v. Jewell*, 160 F. Supp. 3d 194, 202, 205–06 (D.D.C. 2016) (rejecting a FOIA plaintiff's eligibility for fees because "the catalyst analysis is all about causation" and the plaintiff failed to demonstrate a causal link) (citing among others *Cox v. U.S. Dep't of Justice*, 601 F.2d 1 (D.C. Cir. 1979)); Lead Op. at 20 (citing *Church of Scientology*, 700 F.2d at 489).  But none of those opinions did business with the language of the statute,

that effect is dicta, however.  The Court *decided* in that case only that the amended fees provision did not apply retroactively, and therefore did not address the appropriate application of the new provision.

or explained why the courts should add to the statute a requirement that is simply not in the text.

Notably, the causation requirement often led, as it does here, to complicated, fact-bound determinations. *See Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1496 (D.C. Cir. 1984) (explaining that the causation analysis required consideration of whether the agency "made a good faith effort to search out material and to pass on whether it should be disclosed" as well as inquiry into the number of requests pending before the agency and how time-consuming the search process could be) (internal quotation marks and citations omitted); *Church of Scientology*, 700 F.2d at 492 (instructing the district court to determine on remand "what *actually* triggered the documents' release" to the plaintiff) (emphasis added). Congress surely *could* have reinstated the body of pre-*Buckhannon* case law, with its fact-intensive inquiry into causation, by adopting language similar to that used in that case law. For example, it could have borrowed Judge Friendly's formulation that "a plaintiff must show at minimum that the prosecution of the action could reasonably have been regarded as necessary and that the action had substantial causative effect on the delivery of the information." *Vt. Low Income Advocacy Council, Inc. v. Usery*, 546 F.2d 509, 513 (2d Cir. 1976), *abrogated by Union of Needletrades, Indus. & Textile Emps. v. INS*, 336 F.3d 200 (2d Cir. 2003); *see also Church of Scientology*, 700 F.2d at 489 (using the language from *Usery*); *Lovell v. Alderete*, 630 F.2d 428, 432 (5th Cir. 1980) (same).

But Congress did not do that. Instead, Congress opted explicitly to define "substantially prevail[ing]" when it

amended the statute,[6] and to do so differently than the pre-*Buckhannon* cases had.  *See* 5 U.S.C. § 552(a)(4)(E)(ii).

## III

The lead opinion, and the decided cases reading the new statute to incorporate pre-*Buckhannon* law on the catalyst theory, make two points: (1) legislative history indicates that Congress meant to overrule *Buckhannon* and restore the status quo ante for FOIA suits;[7] and (2) a reading of the statute in which complainants can "substantially prevail[]" without in any way causing the disclosure is implausible.

Where the statutory text is clear, it should not be defeated by legislative history unless the plain meaning threatens entirely to frustrate Congress's intentions in enacting the statute.  *See, e.g.*, *King v. Burwell*, 135 S. Ct. 2480, 2495–96 (2015) (adopting a reading of the Affordable Care Act in line with Congress's aim to "improve health insurance markets, not to destroy them").  Legislative history can, however, sometimes throw new light on statutory language that may seem straightforward but that takes on a different coloration in light of a specialized context or linguistic understandings, demonstrated by "how the legislators considering the bill were *speaking* about the statute" at the time of enactment. *James v. City of Costa Mesa*, 700 F.3d 394, 409 n.2 (9th Cir.

---

[6] Before 2007, the terse fees provision in FOIA provided for fees and costs "in any case under this section in which the complainant has substantially prevailed."  5 U.S.C. § 552(a)(4)(E) (2006).

[7] *See, e.g.*, Lead Op. at 18 (quoting floor statement); *Or. Nat. Desert Ass'n*, 572 F.3d at 616 (same); *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 526 (D.C. Cir. 2011) (citing extensively the committee reports and floor statements for the FOIA amendments).

2012) (Berzon, J., concurring in part and dissenting in part). It can also clarify ambiguities created by "the evolution of language over time, a not-infrequent source of error in interpreting statutes of long-standing vintage." *United States v. Kimsey*, 668 F.3d 691, 699 (9th Cir. 2012); *see also Spencer v. World Vision, Inc.*, 633 F.3d 723, 752–55 (9th Cir. 2011) (Berzon, J., dissenting) (interpreting "religious corporation" as a term of art in light of old common-law usage and statutory history).

Examining the legislative history in this instance is useful to confirm that there is no nonobvious reading of the statutory language compelled, or even supported, by that history. To the contrary, the history affirmatively indicates a purposeful decision to avoid the factually difficult causation question.

The lead opinion is correct that the amendments appear to have been motivated by concern about the effect of *Buckhannon* on fees in FOIA cases.[8]   The so-called "Buckhannon fix" was drafted to "clarif[y] that Buckhannon's holding does not and should not apply to FOIA litigation." S. Rep. No. 110-59, at 6 (2007). But that explanation does not include an account of what standard *should* apply instead of "Buckhannon's holding" and so in no way indicates that the straightforward language of Congress does not mean what it says.

---

[8] In particular, the sponsors of the bill worried about the strategic timing of FOIA disclosures by agencies to avoid paying fees. *See* S. Rep. No. 110-59, at 3–4 (2007) ("[F]ederal agencies have an incentive to delay compliance with FOIA requests until just before a court decision that is favorable to a FOIA requestor."); 153 Cong. Rec. S15,704 (daily ed. Dec. 14, 2007) (statement of Sen. Leahy) (same).

Moreover, the drafting history of the amended statute supports my view that § 552(a)(4)(E)(ii)(II) has no causation requirement. Earlier versions of the bill defined a complainant as "substantially prevailing" if she obtained relief through a judicial order or

> if the complainant's pursuit of a nonfrivolous claim or defense *has been a catalyst* for a voluntary or unilateral change in position by the opposing party that provides a substantial part of the requested relief.

OPEN Government Act of 2005, S. 394, 109th Cong. § 4 (2005) (emphasis added); *see also* H.R. 867, 109th Cong. § 4 (2005) (same language). But the next round of bills dropped the "catalyst" element, instead requiring only that a complainant obtain relief through "a voluntary or unilateral change in position by the opposing party, where the complainant's [sic] claim or defense was not frivolous." S. 849, 110th Cong. § 4 (2007); *see also* H.R. 1309, 110th Cong. § 4 (2007) (same except "in a case in which" instead of "where"). In response to a few members' concerns, "not frivolous" became "not insubstantial," the language that was ultimately included in the statute as enacted.

The remarks by drafters of the final bill directly confirm that the decision to leave out a causation concept was deliberate. "Floor statements by the sponsors of the legislation are given considerably more weight than floor statements by other members, . . . and they are given even more weight where, as here, other legislators did not offer any contrary views." *Kenna v. U.S. Dist. Court for C.D. Cal.*, 435 F.3d 1011, 1015 (9th Cir. 2006).

Senator Kyl, a proponent of the amendment that became the statutory language, believed the substantiality test was "well-suited" to evaluating fee requests because "courts should be able to apply [it] without further factual inquiry into the nature of a complaint." 153 Cong. Rec. S10,989 (daily ed. Aug. 3, 2007). By so providing, Senator Kyl reported, the amendment "addresse[d] one of the Supreme Court's major concerns in the Buckhannon case, that 'a request for attorney's fees should not result in a second major litigation.'" *Id.* (citing *Buckhannon*, 532 U.S. at 609)). Senator Kyl, in other words, explained Congress's move away from the earlier "catalyst" language as a quest for a more administrable standard—one in which substantiality, and not causation, is the basis of a fee award. And Senator Kyl recognized that his "not insubstantial" amendment was "very generous to FOIA requesters" and "a pretty low standard" made "in the spirit of compromise." *Id.*

Another sponsor of the bill, Senator Leahy, opined that "a FOIA requester can obtain attorneys' fees when he or she files a lawsuit to obtain records from the Government and the Government releases those records before the court orders them to do so." 153 Cong. Rec. S15,704 (daily ed. Dec. 14, 2007). Senator Leahy's careful explanation of the new fees provision in his own bill captures the mechanics of the provision, which—as his statement reveals—has no causation requirement.

One line in the Senate report accompanying S. 894 did say that the bill "clarif[ies] that a complainant has substantially prevailed . . . if the pursuit of a claim *was the catalyst* for the voluntary or unilateral change in position by the opposing party." S. Rep. No. 110-59, at 6 (2007) (emphasis added). But, as I have noted, the statutory

language does not use the term "catalyst," or "causation," or "because of," or anything similar, in defining "substantially prevailed."   To substitute one phrase in one line in a committee report for the statute's actual definition is to commit the precise sin which has led to the near-complete demise—in my view unfortunate—of legislative history in interpreting statutes: Congress as a whole voted on the statute as written, and should not be taken as instead adopting arguably contrary language in a committee report absent extremely good reason.  *See King*, 135 S. Ct. at 2492–96 (relying on "context and structure" to reject the natural reading of a word because of the "calamitous result[s]" that would otherwise ensue).  Here, there is no such reason.

Clearly, Congress could have chosen to—and initially did—draft a provision codifying the pre-*Buckhannon* catalyst theory, by using the very word "catalyst," which courts had construed for decades to include a causation requirement. But it ultimately chose not to do that.  The statute enacted by Congress and signed by the president did not reinstate the pre-*Buckhannon* definition of "substantially prevailing," but instead devised a new one.  "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l. Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

## IV

We should take no comfort from the fact that other circuits have read into the fees provision a causation requirement, and should not join them in insisting upon this

statutory mirage.[9]  In *Guido v. Mount Lemmon Fire District*, this Court recently disagreed with four other circuits in holding that the twenty-employee minimum in the Age Discrimination in Employment Act did not apply to political subdivisions.  859 F.3d 1168, 1172–74 (9th Cir. 2017).  The other appeals courts relied on parallel legislation and legislative history, notwithstanding the unambiguous words of the directly applicable statute.  *Id.* at 1174–75.  Here, as there, the statute is clear; we need not go outside its text to know that FOIA plaintiffs don't need to show causation to collect fees. The consensus of contrary authority should not disincline us from this reading when that consensus is just wrong.  *Cf. Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) (overruling four circuits' requirement of direct evidence in mixed-motive Title VII cases because they neglected an intervening change in statutory language).

The lead opinion suggests that the fee provision "cannot plausibly be read" in a way that does not incorporate a causation requirement.  Lead Op. at 20.  But the cases it cites for this proposition all pre-date *Buckhannon* and the statutory amendments.  *Id.* at 20.  They are evidence of nothing more than what a pre-*Buckhannon* plaintiff needed to show in order to be "substantially prevailing" under existing judge-made law on fees for catalyst complainants.  To the extent they

---

[9] Only one court seems to have entertained the notion that the statute, read plainly, does not include a causation requirement. *See Sai v. Transp. Sec. Admin.*, 155 F. Supp. 3d 1, 6 n.4 (D.D.C. 2016) ("[U]nder the literal terms of the statute, a plaintiff need only show that the agency has changed its position and that the plaintiff's claim was 'not insubstantial.'"). *Sai* then noted the legislative history discussed above, which it believed counseled in *favor* of such a requirement. Because causation was "likely a non-issue" in that case, however, it did not discuss the question further. *Id.*

impose a causal nexus requirement, they have been superseded by statute and have no bearing on whether fees are available to First Amendment Coalition or any requestor seeking fees under § 552(a)(4)(E)(ii)(II).

But even taking the lead opinion's concern on its merits, my reading of the statute is an entirely plausible one. As Senator Kyl's statement quoted above suggests, Congress probably wanted courts to avoid difficult determinations of causation—as shown by this case—by creating, in effect, a presumption of causation when agencies unilaterally change position as to a possibly meritorious disclosure request after a lawsuit has been filed. The pre-*Buckhannon* standard required difficult multi-factor inquiries by the district courts to determine whether the lawsuit "actually" caused the disclosure or not. Congress could sensibly want a more administrable test for screening out complainants who ought not to recover attorney fees.

Additionally, Congress may have wanted to make whole plaintiffs who simply should not have had to resort to litigation to obtain the information they wanted, having necessarily already made an appropriate, "not insubstantial" request for disclosure to the agency, which was denied. *See* 5 U.S.C. § 552(a)(2)-(3) (providing for disclosure of non-exempt agency documents). The agency's subsequent release of the information, for whatever reason, could be seen as a likely indication that incurring the litigation expenses should have been unnecessary. That the agency has already passed on a chance (often more than one) to hand over requested information before litigation and so without exposure to fees makes FOIA litigation somewhat unusual, and helps explain why Congress concluded that FOIA plaintiffs should at this stage obtain attorney fees if the agency changes its mind

about releasing information only after litigation costs have been incurred.

In short, making FOIA complainants eligible for fees without demonstrating a causal nexus is neither absurd nor "threaten[s] to destroy the entire statutory scheme." *Guido*, 859 F.3d at 1174 (citing *King*, 135 S. Ct. at 2495). Rather, the standard stated quite plainly in the statute is perfectly sensible. It forwards "the philosophy of full agency disclosure" undergirding FOIA, by paying the fees of those who make potentially meritorious requests for information to the agency and obtain the requested information only after filing suit.[10] *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (quoting S. Rep. No. 813, at 3 (1965)). The lead opinion falls into error by insisting, as have other courts to consider the issue, that the amended statute includes a causation requirement that is just not there.

## V

My objection to Judge Murguia's analysis of fee eligibility is fundamentally the same as my objection to the lead opinion. Her alternative theory of eligibility is entirely divorced from the words of the statute we must apply to determine if FOIA plaintiffs are eligible for fees.

---

[10] As a practical matter, where there is litigation pending and the basis for the release of information is substantial, I suspect instances in which the information is released for reasons entirely independent of the litigation are likely rare. The old catalyst theory, after all, required only a "substantial causative effect," not that the lawsuit be the sole or determinant cause of disclosure. *Cf. ACLU v. U.S. Dep't of Homeland Sec.*, 810 F. Supp. 2d 267, 274 (D.D.C. 2011) (finding that the litigation "substantially caused" the release of some documents even though others were released in the course of defendant's administrative response).

Under Judge Murguia's approach, First Amendment Coalition is eligible for fees because it *would have* prevailed on the merits but for unilateral government action, in this case the failure of the government to disclose to the district court that the White Paper had been officially released. Concurring Op. at 49. Judge Murguia maintains that her approach is "consistent with FOIA's text," Concurring Op. at 48, but her concurrence fails to engage with the text of 5 U.S.C. § 552(a)(4)(E)(ii)(II) at all.

Again, a plaintiff who does not obtain a judgment may nonetheless "substantially prevail," and thus be eligible for fees, if she has obtained relief through a voluntary or unilateral change in agency position on a "not insubstantial" claim. 5 U.S.C. § 552(a)(4)(E)(ii)(II). Judge Murguia's approach replaces the words of the statute with a different substantive standard: the plaintiff is eligible if she is "*correct* on the merits" (emphasis added), or *would have* prevailed in the FOIA suit, but for the government's unilateral action "outside [the plaintiff's] control."[11] Concurring Op. at 50.

However consistent this approach is with the "purpose" of FOIA, Concurring Op. at 48, it has no textual warrant in the statute. Whereas the lead opinion just reads an extra element into § 552(a)(4)(E)(ii)(II), Judge Murguia sketches an additional theory of recovery that does not overlap at all with § 552(a)(4)(E)(ii)(II). Where the statute requires only a "not insubstantial" claim, her analysis demands an actually meritorious one. Concurring Op. at 50. Where the statute

---

[11] Judge Murguia implies bad faith on the part of the government in this case, a suggestion on which I take no position. It is not clear if bad faith is required under her theory of eligibility or is merely one instance of action but for which a plaintiff would have recovered.

requires a voluntary or unilateral change in position by the government agency, this approach calls for "unilateral action" that "prevent[s] [the plaintiff] from prevailing" on its claim. *Id.* at 12. Whatever the merits of this set of requirements as a policy for punishing bad-faith litigation conduct,[12] it is contrary to the text of the statute we must apply when awarding fees to FOIA plaintiffs. The arguments against reading a causal nexus requirement into § 552(a)(4)(E)(ii)(II), discussed in Parts II-IV above, apply with equal, if not more, force to an alternative basis for eligibility that finds support in neither the text of the statute *nor* once-applicable (but now superseded) circuit law on catalyst recovery.

Finally, I note once again that one result of Judge Murguia's alternative analysis is that there is no majority holding as to whether, absent judicial relief, a plaintiff *must* demonstrate a causal nexus between the lawsuit and the disclosure.

## VI

Applied to the facts of this case, First Amendment Coalition is a "substantially prevailing" complainant. It obtained relief—the OLC-CIA memo—before judgment through a voluntary change in position by the Department of Justice on a "not insubstantial" claim. *See* Lead Op. at 18 n.12 (noting the government's concession that the claim is not insubstantial). The statute does not require us to, and indeed we may not, "read an absent word" (or provision) into the statute. *Lamie*, 540 U.S. at 538.

---

[12] There are other measures for dealing with bad-faith litigation tactics, like sanctions, that have the virtue of not altering the substantive law.

*    *    *    *    *

For these reasons, I concur only in the judgment (with one exception noted, *see* note 1, *supra*).

---

MURGUIA, Circuit Judge, concurring in part and concurring in the judgment:

I write separately to explain my reasoning in this challenging case.

FOIA allows for an award of attorney fees to eligible parties who can show their entitlement to fees. Where a FOIA plaintiff prevails on the merits of her claim, eligibility for fees is straightforward. Where a FOIA plaintiff does not prevail on the merits of her claim, but the Government nonetheless releases some or all of the information sought through a unilateral disclosure, eligibility for fees is less straightforward. The leading test for analyzing eligibility in these circumstances asks whether the plaintiff's litigation was a "substantial causative effect" of the disclosure of the information. *See Church of Scientology of Cal. v. U.S. Postal Serv.*, 700 F.2d 486, 489 (9th Cir. 1983). In keeping with its name, the substantial causative effect test has long incorporated a causation requirement. *See, e.g.*, *Long v. IRS*, 932 F.2d 1309, 1313 (9th Cir. 1991). We sometimes refer to this as a "catalyst theory" of recovery. *Oregon Nat. Desert Ass'n v. Locke*, 572 F.3d 610, 612, 615 (9th Cir. 2009).

This case concerns whether First Amendment Coalition, a FOIA plaintiff, is eligible for an award of attorney fees. The district court concluded that First Amendment Coalition

did not prevail on the merits or satisfy the "substantial causative effect" test for a catalyst recovery, and was therefore ineligible for an award of fees. The appeal of that decision presents three distinct questions: (1) whether the catalyst theory and its "substantial causative effect" test still includes a causation requirement under the amended text of FOIA; (2) whether the district court clearly erred in its factual finding on causation; and (3) whether First Amendment Coalition is eligible for an award of attorney fees.

On the first question, I join in the analysis of part II of the opinion, finding that recovery under a catalyst theory continues to require causation. On the second question, I do not join in the opinion's analysis, because I do not agree that the district court clearly erred in its causation finding. On the third question, I conclude that First Amendment Coalition is eligible for fees. The Department of Justice (the DOJ) prevented First Amendment Coalition from prevailing on the merits, and the district court erred by failing to take into account the DOJ's conduct when analyzing eligibility. I therefore concur in reversing the district court's judgment on First Amendment Coalition's eligibility for a fee award, and in remanding to consider First Amendment Coalition's entitlement to fees.

## I. Background

In 2010, lawyers in the Office of Legal Counsel (OLC) in the DOJ wrote two memoranda analyzing the targeted killing of an American citizen abroad: a memorandum from the OLC to the U.S. Department of Defense (the OLC-DOD Memorandum) and a memorandum from the OLC to the Central Intelligence Agency (the OLC-CIA Memorandum). These memoranda were not public, and various Government

agencies refused to confirm or deny their existence. When First Amendment Coalition submitted its FOIA request in 2011, these two memoranda were within the scope of the request. DOJ did not provide these memoranda to First Amendment Coalition, or confirm or deny their existence. First Amendment Coalition then litigated in pursuit of the still-undisclosed and unacknowledged responsive materials in the United States District Court for the Northern District of California (NDCA). Other parties brought similar FOIA actions in the United States District Court for the Southern District of New York (SDNY).

The SDNY plaintiffs lost on the merits of their suit in early 2013. *N.Y. Times Co. v. U.S. Dep't of Justice* (*NY Times I*), 915 F. Supp. 2d 508, 516–18 (S.D.N.Y. 2013). Later that year, the United States Government acknowledged the OLC-DOD Memorandum after a series of other related disclosures, most notably an internal "White Paper" summarizing the OLC legal rationales. The DOJ and other agencies, however, did not make the OLC-DOD Memorandum public, and did not disclose the existence of the OLC-CIA Memorandum.

In the NDCA litigation, the DOJ and First Amendment Coalition filed cross-motions for summary judgment regarding the release of the materials First Amendment Coalition had requested. The DOJ did not mention the White Paper in the opening brief for its second motion for summary judgment. After First Amendment Coalition emphasized the leaked White Paper in its briefing, the DOJ in its reply to its motion for summary judgment and opposition to First Amendment Coalition's cross-motion stated: "The White Paper is a draft document that was originally provided in confidence to Congress; the Executive Branch later

acknowledged the draft document." The DOJ did not inform First Amendment Coalition or the district court that it had provided the White Paper to a news organization called Truthout in response to Truthout's separate FOIA request. *See N.Y. Times Co. v. U.S. Dep't of Justice* (*NY Times III*), 756 F.3d 100, 110 n.9 (2d Cir. 2014) (noting the United States also never informed the ACLU, a plaintiff in the SDNY litigation of this release). This action constituted an intentional public release and disclosure of the White Paper, rather than a mere acknowledgment, and that distinction proved critical.

In early 2014, the NDCA district court ruled against First Amendment Coalition on the merits of the cross-motions for summary judgment. In its order, the district court observed that First Amendment Coalition "makes much of the fact that the unclassified White Paper prepared for Congress has been leaked and acknowledged by the Government. However, there has been no 'official disclosure' of the White Paper." The district court's statement that there was no official disclosure was incorrect given the prior DOJ release of the White Paper in response to the Truthout FOIA request. *Id.*

Ten days after the NDCA district court ruled against First Amendment Coalition on the merits, the Second Circuit reversed the SDNY district court and ordered the release of a redacted version of the OLC-DOD Memorandum. *N.Y. Times Co. v. U.S. Dep't of Justice* (*NY Times II*), 752 F.3d 123, 126 (2d Cir.), *opinion revised and superseded*, 756 F.3d 100 (2d Cir. 2014). In its opinion, the Second Circuit determined that the OLC-DOD Memorandum's legal analysis was no longer exempt from FOIA disclosure because of the release of the White Paper and public statements by United States officials. *Id.* at 141. The Second Circuit specifically

noted that the White Paper made a dispositive difference, focusing on the effect of the White Paper in showing waiver of the United States' privilege arguments:

> Even if these statements assuring the public of the lawfulness of targeted killings are not themselves sufficiently detailed to establish waiver of the secrecy of the legal analysis in the OLC-DOD Memorandum, they establish the context in which the most revealing document, disclosed after the [SDNY] District Court's decision, should be evaluated. That document is the DOJ White Paper[.]

*Id.* at 138; *see id.* at 141 ("Whatever protection the legal analysis might once have had has been lost by virtue of public statements of public officials at the highest levels and official disclosure of the DOJ White Paper.").

The Second Circuit's opinion also included the following paragraph, referencing the NDCA litigation:

> The recent opinion of the District Court for the Northern District of California, . . . denying an FOIA request for the OLC-DOD Memorandum, is readily distinguishable because the Court, being under the impression that "there has been no 'official disclosure' of the White Paper," . . . did not assess its significance, whereas in our case, the Government has conceded that the White Paper, with its detailed analysis of legal reasoning, has in fact been officially disclosed.

*Id.* at 139 (internal citations omitted).

The Second Circuit subsequently published the OLC-DOD Memorandum in a revised decision. *See NY Times III*, 756 F.3d at 104. Shortly after, the DOJ disclosed the existence of and voluntarily released the OLC-CIA Memorandum to plaintiffs in the SDNY and to First Amendment Coalition. The precise reasons why the DOJ voluntarily disclosed the existence of and released the OLC-CIA Memorandum are in dispute between the parties and there is almost no direct evidence of why the DOJ made that decision.

## II. Catalyst Theory

First Amendment Coalition argues that the NDCA litigation substantially caused the release of the OLC-DOD Memorandum and the OLC-CIA Memorandum. First Amendment Coalition's principal theory for why it had a "substantial causative effect" on the DOJ's release of both the OLC-DOD and OLC-CIA memoranda is that its NDCA litigation—and the prospect of Ninth Circuit review— affected the Government's choices. First Amendment Coalition points to the DOJ's decision not to contest the release of the OLC-DOD memorandum the Second Circuit ordered, and the DOJ's decision to release the OLC-CIA memorandum before any federal court ordered the DOJ to do so. The NDCA district court rejected First Amendment Coalition's arguments, finding that the DOJ "in this case released the documents largely as a result of the Second Circuit's ruling in *NY Times*, not as a result of the ruling in this case."[1]

---

[1] It appears the district court was referring to *NY Times II*.

The district court's ruling on causation is a factual finding, and we review for clear error. *See Ass'n of Cal. Water Agencies v. Evans*, 386 F.3d 879, 886 (9th Cir. 2004). Here, there is evidence to support First Amendment Coalition's position, but there is also evidence consistent with the district court's finding.[2]  When one of two plausible explanations supports the district court finding, there cannot be a "definite and firm conviction that a mistake has been committed." *N. Queen Inc. v. Kinnear*, 298 F.3d 1090, 1095 (9th Cir. 2002) (quoting *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002)).  Therefore, in my view, we must accept the district court's finding of causation, even if there is some cause to doubt it. *Ass'n of Cal. Water Agencies*, 386 F.3d at 886.  Because I think we must uphold the district court's factual finding with respect to both responsive memoranda, I conclude First Amendment Coalition cannot show eligibility for fees under a catalyst theory. *See Long*, 932 F.2d at 1313.

---

[2] For instance, we have two available explanations for why the DOJ ultimately voluntarily disclosed the OLC-CIA Memorandum to First Amendment Coalition.  The first explanation is that the DOJ concluded that the waiver determinations the Second Circuit made regarding the OLC-DOD Memorandum applied with equal force to the OLC-CIA Memorandum. *See NY Times III*, 756 F.3d at 117.  In other words, in response to the Second Circuit decision and subsequent SDNY district court order, the DOJ conceded.  The second explanation is that the DOJ wanted to end the NDCA litigation.  (I note that the DOJ had not yet responded to the NDCA district court's order to provide an explanation for why the DOJ conceded official disclosure of the White Paper in one federal forum but made no mention of official disclosure in another.  The district court had ordered the DOJ to explain this inconsistency if the case was not moot, and disclosing the OLC-CIA Memorandum prevented the DOJ from needing to respond.)  The first explanation supports the district court's finding of causation; the second explanation suggests the district court's finding of causation was in error, and supports First Amendment Coalition's eligibility for fees.

I therefore do not join in the opinion to the extent it reverses the district court while still applying a catalyst theory.

## III. A Different Ground for Fee Eligibility

In the majority of FOIA fee cases, the catalyst theory of recovery will be the appropriate way to analyze the plaintiff's eligibility for fees. But, to my mind, a catalyst theory of recovery does not suit the facts of this case.

In my view, however, there is no need to rely on a catalyst theory or re-write the "substantial causative effect" test.[3] We can instead resolve the case by returning to the purposes underlying the test, and reframing them for the unique circumstances presented here. After doing so, it is clear that First Amendment Coalition has another viable theory for eligibility, equally consistent with FOIA's text and purpose.

At the time of its adoption, the substantial causative effect test established "that a court judgment is not a prerequisite for an attorney fees award under" FOIA. *Nationwide Bldg. Maint., Inc. v. Sampson*, 559 F.2d 704, 708–09 (D.C. Cir. 1977). In practice, the test recognizes that plaintiffs in FOIA suits do not need to secure a judgment on the merits to receive attorney fees. The purpose behind this rule is simple: when the Government takes unilateral action—completely outside the plaintiff's control—such action should not prevent the plaintiff from receiving compensation for a meritorious claim. *See Church of Scientology*, 700 F.2d at 492 (noting that "the mere fact that defendants have voluntarily released

---

[3] As noted above, I join in the opinion's conclusion that causation remains a requirement of the "substantial causative effect" test for a catalyst theory of recovery. *See* Opinion, Part II.

documents does not preclude an award of attorney's fees to the plaintiff").

To illustrate, suppose the Government, on the eve of defeat in FOIA litigation, unilaterally releases the requested information, thereby mooting the case and preventing the plaintiffs from securing a judgment. The plaintiffs' efforts in litigation compelled the disclosure of information, and the plaintiffs would have prevailed absent the Government's conduct. Accordingly, we would award attorney fees to the plaintiffs under a catalyst theory, even though they did not secure a judgment on the merits. The instant case presents a different variation on this situation, but the same considerations should still apply.

First Amendment Coalition and the SDNY FOIA plaintiffs sought the same underlying materials for the same reasons. The DOJ then took a unilateral action that prevented First Amendment Coalition from prevailing on the merits, by failing to describe the White Paper candidly to the NDCA district court. Because the DOJ did not inform First Amendment Coalition or the NDCA district court about the official release of the White Paper in response to the FOIA request, the DOJ deprived the NDCA district court of the opportunity to rule on a complete record. The district court even admitted that it "may not have been fully apprised of the facts surrounding the White Paper" in making its earlier ruling, a conclusion reached only with the clarity provided by the Second Circuit decision. The Second Circuit recognized the White Paper was critical, and that the DOJ's representations to the NDCA district court had differed in a material way. Something has gone wrong when a district court learns of relevant information first from another court, let alone material, case-dispositive information. *E.g.*, *United*

*States v. Shaffer Equip. Co.*, 11 F.3d 450, 459 (4th Cir. 1993) (holding that failure to disclose information that "could conceivably have affected the outcome of the litigation . . . violates the general duty of candor that attorneys owe as officers of the court").

First Amendment Coalition failed to prevail primarily because of unilateral Government actions, outside its control.[4] The district court erred in not recognizing the significance of the DOJ's litigation conduct for the FOIA eligibility analysis. By characterizing the White Paper inconsistently between two federal fora, the DOJ deprived First Amendment Coalition of the fair chance for the court to hear its arguments on the merits. The first and only federal court to consider the merits of whether the official disclosure of the White Paper affected the FOIA analysis concluded that the White Paper made a decisive difference. In the course of its decision, the Second Circuit also observed that the *only* apparent difference between the case before it and the case before the NDCA district court was that the NDCA district court had a different understanding of the White Paper's significance. The district court here did not draw its understanding from the ether; it relied on the Government's representations. If the NDCA district court had in front of it the same information available to the Second Circuit, the NDCA district court likely would have reached the same result as the Second Circuit—or we would have, on appeal.

---

[4] In her opinion, Judge Berzon suggests that my reasoning implies bad faith on the part of the government in this case. I am not aware of the circumstances surrounding the DOJ's action, but the fact that the district court was not made aware of the White paper's disclosure was critical for First Amendment Coalition's inability to prevail on the merits and establish eligibility for attorney fees.

Under these circumstances, the same rationales apply as in "substantial causative effect" cases. First Amendment Coalition acted in good faith, brought a timely action, and was correct on the merits. A ruling in First Amendment Coalition's favor would likely have made First Amendment Coalition eligible without even the need to rely on any alternate theory of recovery. *See* 5 U.S.C. § 552(a)(4)(E)(i). First Amendment Coalition was unable to recover because of the DOJ's unilateral action in how the DOJ characterized the White Paper to the court. The DOJ prevented First Amendment Coalition from prevailing and establishing its eligibility via a favorable judgment, *id.* § 552(a)(4)(E)(i), and we therefore may look to alternate bases establishing First Amendment Coalition's eligibility to recover, *id.* § 552(a)(4)(E)(ii). The district court erred as a matter of law by not accounting for the DOJ's actions when analyzing First Amendment Coalition's eligibility for recovery, and by limiting its analysis to actual causation.

Accordingly, I would reverse the district court for legal error, not for its underlying causation finding. When we take into account the DOJ's conduct, First Amendment Coalition has established its eligibility for an award of fees. I therefore join my colleagues in reversing the district court ruling on eligibility, and remanding for a determination of First Amendment Coalition's entitlement to fees.[5]

---

[5] In analyzing whether First Amendment Coalition is entitled to fees, as opposed to merely eligible, the district court will be able to consider agency behavior or reasonableness. *See Batton v. IRS*, 718 F.3d 522, 527 (5th Cir. 2013); *Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1390 (8th Cir. 1985).